764 So.2d 164 (2000)
STATE of Louisiana
v.
Gerald J. LEWIS.
No. 00-KA-80.
Court of Appeal of Louisiana, Fifth Circuit.
May 30, 2000.
*165 Margaret S. Sollars, Louisiana Appellate Project, Thibodaux, Louisiana, Attorney for Appellant Gerald J. Lewis.
Paul D. Connick, Jr., District Attorney, Ellen S. FantaciAttorney of Record on Appeal, Terry M. Boudreaux, Assistant District Attorney, Appellate Section, Courthouse Annex, Joseph A. Aluise, George Wallace, Jr., Trial Attorneys, Assistant District Attorneys, Gretna, Louisiana, Attorneys for Appellee State of Louisiana.
Panel composed of Judges EDWARD A. DUFRESNE, Jr., JAMES L. CANNELLA and MARION F. EDWARDS.
CANNELLA, Judge.
Defendant, Gerald Lewis, appeals his conviction of second degree murder, a violation of La. R.S. 14:30.1. We affirm the conviction and sentence.
On November 18, 1997, Defendant was charged with the second degree murder of Felton Lorio. He was tried by a jury on April 20, 21 and 22, 1999 and found guilty as charged. On May 21, 1999, the trial judge sentenced Defendant to life imprisonment at hard labor, without benefit of *166 parole, probation or suspension of sentence.
The homicide occurred during a brawl between two groups of young men on September 15, 1997 in Gretna, Louisiana. During the fight, Felton Lorio was shot eight times by Defendant. Defendant concedes that he shot the victim and that the victim's death was caused by two fatal gunshot wounds to the victim's left lower-chest and left mid-chest. However, Defendant claims he shot Felton Lorio in self-defense.
On September 15, 1997, Robert Lorio (Robert), the victim's 17 year old brother, along with Lakendra James (Lakendra), and Asa Augusta (Asa) rode the school bus from West Jefferson High School to Lakendra's house in an area known as Gretna Green. Robert lived in Algiers. Lakendra was his girlfriend and lived across the street from Gretna Green park.
After arriving at Lakendra's home, the three teenagers stood outside talking. At some point, Lakendra left the boys and went into the house. Robert and Asa remained outside. While they were there, Felton Lorio, rode up on his bicycle. The young men decided to walk to the corner store. They intended to go in, but changed their minds because they noticed a group of other young men, the "Gretna boys", in the area. The three boys circled the block, returning to Lakendra's house. A short time later, Robert's other brother, Chris Evans (Chris), arrived at the house by bicycle. Shortly after his arrival, two cars pulled up at the house and the occupants exited. These were older young men and members of a gang called the "Scottsdale Posse," also known as "Deuce Deuce." These men had SP scarves and tattoos denoting membership in the "Scottsdale Posse." Robert and Felton Lorio were not members of the gang, but were friends with various members.
At the same time, another group of boys, known as the "Gretna Green boys", were lounging in the park across the street from Lakendra's house. The "Gretna Green boys" were members of the "OTG" or "Out in the Green Gang Posse," which was also called "Gretna Green." Robert thought two of them, Keith Dennis (Keith) and Marcus Huland (Marcus), were involved in an incident two days before, in which he was beaten and his gold chain was stolen. However, although he had identified two of the perpetrators right after the incident, he did not report his suspicion of Keith and Marcus to the police.
After the Scottsdale Posse members arrived, Robert, Felton Lorio, Chris, and Asa walked across the street to confront the "Gretna Green boys" to find out why Robert had been attacked and robbed. The Scottsdale Posse members followed as back-up. The four entered the park, which was surrounded by a six-foot fence and angry words were exchanged between Keith and Robert. At that point, Robert removed his shirt. This was a sign that they were ready to fight and a fistfight started between Felton Lorio and Keith and between Robert and Marcus. Approximately 15 to 20 other young men watched the fight, including Asa, Chris, and the members of the Scottsdale Posse. Defendant was sitting outside of the park fence with some of the spectators. He was not involved in the fight.
Shortly after the fight between the four men started, Tracey Stewart, one of the Gretna Green group, grabbed a crutch and hit Chris in the head. This started a melee among the Gretna boys and Robert's friends. Robert testified that when the melee started, Defendant came into the park and headed for Felton Lorio. When Felton Lorio saw Defendant behind him, he stopped fighting with Marcus and turned toward the Defendant. Defendant and Felton Lorio then moved to a corner of the park, about 15 feet away from everyone else and started fighting. At the time, Defendant had his shirt on, but Felton Lorio was shirtless, since he had also *167 removed his shirt prior to the beginning of the initial fight.
Robert testified that after the Defendant and his brother moved away, he saw Defendant push his brother to the ground, step back, reach under his shirt, pull out a gun, and fire at the ground toward Felton Lorio. After the first shot, everyone in the park fled, and, as they were fleeing, Robert heard more shots. Robert turned around to see who was shot. He said that he saw Chris trying to help Felton Lorio, who was trying to get up. Robert discovered later that the victim was his brother. Robert further testified that Felton Lorio did not have a weapon. He said that the Defendant was the only one in either group that had a gun.
Asa also testified that the Defendant was the only armed person and that the Defendant had the gun when he entered the park. Asa saw the Defendant unwrap the weapon from a Saint's T-shirt, while Felton Lorio was still engaged in a fistfight with Keith. Asa testified that when the Defendant approached to within three feet of Felton Lorio, who was not wearing a shirt, the Defendant pulled the gun and fired one shot. After Asa heard the shot and saw Felton Lorio fall, everybody fled. However Asa saw Chris go back to Felton Lorio and try to help him. Asa stated that the Defendant was not involved in the fistfight before he approached Felton Lorio.
Gerald Ruffin (Gerald), one of the Scottsdale Posse gang who acted as backup, testified that he knew there was supposed to be a fistfight that day because of the stolen chain incident. He denied that he or anyone in his group had a weapon. Gerald also testified that Felton Lorio was shirtless. He stated that he could see that Felton Lorio did not have a weapon concealed in his waistband because he was not wearing a shirt and the only thing visible at Felton Lorio's waist was his boxer shorts. Gerald stated that the Defendant was not previously involved in the fighting, but that he joined in when the melee started. Gerald saw the Defendant unwrap a gun from a Saint's T-shirt when Felton Lorio was fistfighting someone else. When Felton Lorio and the Defendant moved away from the others, Gerald saw the Defendant fire one shot at him. Felton Lorio was a few feet away from the Defendant when he was shot. As everyone ran, Gerald heard approximately eight more shots.
Lakendra watched the fight from outside the park fence and testified that she saw the Defendant and Felton Lorio fighting. She observed the Defendant jump away from Felton Lorio and pull a gun from under his shirt. Felton Lorio jumped back, after which, the Defendant shot him one time. Lakendra said that, when Felton Lorio fell to the ground, the Defendant stood over him, continuing to shoot. Then the Defendant ran away. After the shooting, Chris went to help his brother and stayed with him until police arrived.
An expert in forensic pathology, Dr. Fraser McKenzie, testified that Felton Lorio sustained eight gunshot wounds to his midline chest, lower chest, lower abdomen, groin, knee, right upper leg, left arm, and right lower leg. The two wounds to the chest area were fatal. Six projectiles were recovered from the body. Dr. McKenzie's examination revealed that Felton Lorio had no defensive wounds and no contact wounds from the firearm, indicating that the gun was fired from a distance greater than six inches to two feet away.
Detective Russell Lloyd testified that the Defendant led him to where he had hidden the gun, a semi-automatic weapon. The detective stated that, in order to fire the gun, the trigger had to be squeezed for each shot. He said that the shell casings were ejected as each shot was fired. Detective Lloyd was with the Defendant shortly after the homicide. He stated that the Defendant had no observable injuries, bleeding, scrapes, or bruises.
*168 Officer Jason DiMarco arrived in time to see people running from the scene. He ordered the men entering the Oldsmobile to stop, while Officer Raymond Lassiegne patted them down for weapons. No weapons were discovered.
Officer Lassiegne testified that he called the emergency medical service for Felton Lorio. He did not see anyone near the body when he arrived. However, he recalled that one of the boys told him that Felton Lorio was the brother of one of the boys and that he had been shot. Thus, he proceeded to the area where Felton Lorio was lying on the ground.
Detective Wayne Lawrence arrived after Felton Lorio was in the ambulance. He said that the officers conducted a search of the immediate area around the body and found eight shell casings, one which was under the victim's pants. In an area approximately 15 feet away from the body, they discovered a metal bar and a crutch, but did not locate any guns during a more extensive search. All the shell casings that were recovered from the scene were from the same manufacturer, the same caliber, and matched those in the gun that was recovered from the Defendant.
Through Detective Lawrence, the State introduced and played for the jury the Defendant's inculpatory taped statement in which he alleged that he was hit with a billy club before the shooting. However, the detective said that the Defendant showed no sign of injury, did not complain of injury, and did not ask for medical aid. Although the Defendant said that Felton Lorio had an automatic .380 or 9 millimeter weapon, and that Felton Lorio fired the first shot, a K-9 (canine) and visual search for those casings, which would have been ejected, was negative. After extensive canvassing and interviewing witnesses, there was no other evidence that surfaced to corroborate the Defendant's version and the investigation showed that only the Defendant's gun was involved in the shooting. Later, someone found a billy club within a block of the park and turned it over to the police.
Forensic expert, Jim Churchman, testified that a gunshot residue test was performed on the Defendant four hours and 40 minutes after the homicide. The test was inconclusive, which is not unusual. He said that, even if a person does not wash his hands after firing a gun, any residue that might have been present initially would have been wiped off just by normal use of the hand, since the residue is not embedded in the hand, but is only on the surface. As a matter of laboratory policy, Felton Lorio's hands were not tested for gunshot residue.
Louise Walzer, a firearms expert, testified that the Defendant's gun was a Jennings Bryco, nine millimeter, semi-automatic pistol, with a ten shot magazine capacity. All eight casings recovered from the scene were fired from the gun. Bullets, test fired from the gun, matched the recovered projectiles, with the exception of one, which did not have adequate markings on it to permit a conclusion.
The defense presented nine witnesses. The first two were character witnesses. Coach Gordon Stackel testified of the Defendant's non-violent character when he was in junior high school. Charles Garrison, principal at West Jefferson High School, testified of the Defendant's nonviolent disposition when he attended that school.
Terrell Oliver (Terrell), the older brother of Marcus, testified that he was at the park that day when the boys got off the bus. Marcus was with Keith and Sherlita Stalbert (Sherlita). Terrell said that he saw two "dudes" fighting with Marcus and Keith in the park, but did not see the Defendant. However, when the fighting escalated, he saw the Defendant join the fray. Terrell did not witness the actual shooting, but testified that he heard one shot, followed by several more. When he saw Felton Lorio lying on the ground, he told the Defendant to run. Terrell said that he did not see the Defendant or Felton *169 Lorio with a gun, and also did not see anyone with a billy club, although some of the Scottsdale people had sticks and weapons.
Marcus testified that the probable reason that Robert was robbed two days earlier was because Felton Lorio had gone to "their" bus stop two weeks before and wanted to know if "they" wanted to "jump him." (R.pp. 471). According to Marcus, there was no "Gretna Green" gang. He said that the group of men were just friends from the area. He denied that they wore green to signify gang membership.
Marcus stated that before this fight, near the corner store, Keith "had words" with Robert, Asa, and Felton Lorio about the robbery. Marcus agreed that the fight started as a fistfight between himself and Robert, and between Felton Lorio and Keith. But, it escalated into a "free-for-all." Marcus did not witness the actual shooting because he was fighting a man with a billy club. Except for the billy club, Marcus did not see any other weapons. He did not see the Defendant carrying a gun.
Keith did not witness the actual shooting because he was fighting at the time. He admitted that he and Felton Lorio argued prior to the fight, and, further, that he challenged Felton Lorio to the fistfight. After Felton Lorio removed his shirt, the fight started. However, contrary to other testimony, Keith asserted that he saw a gun handle stuck in Felton Lorio's left waistband when they were fighting. He also claimed that, even after he threw Felton Lorio against the park fence, the gun did not fall out of Felton Lorio's waistband. Keith also claimed that Robert and Felton Lorio and the Scottsdale group had billy clubs, pipes and "a lot of stuff." He stated that he and Felton Lorio had fought each other in the past.
Keith also denied that there was a "Gretna Green" gang. Like Marcus, he said that the men were simply close friends. Keith conceded that he knew about the theft of Robert's neck chain two days earlier and also admitted that, until the trial, he had never told the police that Felton Lorio was carrying a gun during the fight.
Toynell Williams (Toynell) initially testified that he saw the Defendant shoot Felton Lorio, but could not remember any other details about the shooting. He later recanted that testimony. Toynell also said that he saw someone with a billy club and another with something that looked like a car jack during the fight. Toynell stated that the only gun that he saw was possessed by Felton Lorio, but conceded that Felton Lorio did not shoot the weapon.
Sherlita did not see the actual shooting, but afterward she, Marcus and Terrell ran to her house. At that time, neither Marcus nor Toynell mentioned that Felton Lorio had a gun. Sherlita also testified that none of the "Gretna Green" people had weapons. She stated that some of the boys in the other group had billy clubs and sticks.
Daryln Robinson testified that she witnessed the general fighting and did not see any weapons on the Scottsdale people that day. She did not witness the shooting but, after the shooting stopped, she saw Robert start to run away, then go back and stoop down to his brother.
The Defendant testified in his own behalf. He denied knowing that there would be a fight that day, but knew that Dennis, Marcus and Toynell "passed words" with Robert and Felton Lorio and Asa, because he was at the park and saw them talking. He did not know Felton Lorio, but after he saw the two cars drive up at Lakendra's house with the Scottsdale Posse men, he decided to arm himself with a weapon. He testified that he went across the street to his uncle's car and got the gun that was kept under the seat. The Defendant then concealed the gun in a Saint's T-shirt, put it in his back pocket, and went back to the park to watch the unfolding events. Although he conceded that he did not see *170 anyone else with weapons at the time, he got the gun for protection anyway, anticipating trouble. After the general fighting broke out, the Defendant entered the park. He said that he saw someone with a billy club, someone with an "iron metal," and one guy with a gun who had retreated from the fight.
According to the Defendant, while he was standing in the park with his hand on his gun in his back pocket, someone hit him on the left side of his face with a billy club. He said that he reacted by drawing his gun and hitting that person with it. Because it was not held tight, the gun fell out of his hand. As he retrieved it, he saw that it was Felton Lorio who had hit him with the billy club. The Defendant claimed that Felton Lorio then took a couple of steps toward him and reached into his waistband for a gun that the Defendant said he saw in Felton Lorio's waistband. At that time, a shot was fired. The Defendant claimed that the first shot came from Felton Lorio or someone else, but he did not know who fired the first shot. Nevertheless, the Defendant pointed his gun at Felton Lorio and shot him eight times. Defendant said that he shot so many times because he was scared and nervous. After shooting Felton Lorio, the Defendant ran to a neighbor's apartment. He hid the gun under the steps of another nearby apartment. Afterwards, he told his uncle that he would turn himself in to Detective Lloyd. When the detective arrived, the Defendant was cooperative and showed him the location of the gun.
On appeal, the Defendant asserts that the evidence does not support a conviction for second degree murder. Second, he contends that the trial judge erred in allowing evidence of an "armed" robbery into the proceedings, when the State admitted that the Defendant was not a participant in that robbery.
In the first assignment of error, the Defendant admits shooting Felton Lorio. However, he claims that the State failed to prove that he had the specific intent to kill him, or that he did not act in self-defense.
The standard for appellate review of the sufficiency of evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); State v. Abercrombie, 375 So.2d 1170, 1177-1178 (La. 1979), cert. denied, Abercrombie v. Louisiana, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980); State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722, (1998); State v. Barnes, 98-932 (La.App. 5th Cir. 2/10/99), 729 So.2d 44, 46, writ denied, 99-1018 (La.9/17/99), 747 So.2d 1099. Under Jackson, a review of a criminal conviction record for sufficiency of evidence does not require a court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Barnes, 729 So.2d at 46. A reviewing court is required to consider the whole record, and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. It does not "serve as a vehicle for a reviewing court to second guess the rational credibility determinations of the fact finder at trial." State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291, 1293.
Second degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1A(1). In order to prove second degree murder, the State must prove (1) the killing, and (2) specific intent to kill or inflict great bodily harm. Id.; State v. Williams, 97-1135 (La.App. 5th Cir. 5/27/98), 714 So.2d 258, 263; Barnes, 729 So.2d at 46.
Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively *171 desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). The determination of specific criminal intent is a question of fact. State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, 373, cert. denied, Seals v. Louisiana, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Lewis, 97-160 (La.App. 5th Cir. 7/29/97), 698 So.2d 456, 459. Specific intent may be inferred from the circumstances and the actions of defendant. Seals, 684 So.2d at 373; Lewis, 698 So.2d at 459. In addition, specific intent to commit second degree murder may be inferred from the pointing of a gun at close range and pulling the trigger. Seals, 684 So.2d at 373; State v. Thorne, 93-859 (La.App. 5th Cir. 2/23/94), 633 So.2d 773, 777.
La. R.S. 14:20 provides that a homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger....
When a defendant claims self-defense, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. Barnes, 729 So.2d at 46. In Barnes, we stated further:
The relevant inquiry on appeal is whether a rational fact finder, after viewing the evidence in the light most favorable to the prosecution, could have found, beyond a reasonable doubt, that the homicide was not committed in self-defense. The determination of defendant's culpability focuses on a two-fold inquiry, whether, from the facts presented, defendant could reasonably have believed his life to be in imminent danger, and whether deadly force was necessary to prevent the danger. While there is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a defendant had a reasonable belief that deadly force was necessary to avoid the danger.
Barnes, 729 So.2d at 46 (citations omitted)
Under La. R.S. 14: 21, an aggressor cannot claim self defense. The statute states:
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
In this case, the Defendant claims that Felton Lorio hit him with a billy club during the fight and that Felton Lorio began to reach for a gun in his waistband. He claimed that the first shot was then fired by someone other than himself. He did not know who fired the shot. The Defendant and his witnesses claim that Felton Lorio had a gun. Other witnesses deny that Felton Lorio was armed. It is undisputed that Felton Lorio was shirtless.
The evidence shows that the Defendant jumped into the fight without justification. No one involved in the fight was threatened by anyone pointing a gun at anyone else. For the most part, the fighters were using their fists, although some of the fighters may have had sticks. At any rate, the Defendant did not have to participate in the melee. And he certainly did not have to carry a gun into the midst of the fighters. He chose to enter the fray armed with a deadly weapon. Thus, the Defendant was the aggressor in this incident. Furthermore, the jury rejected the Defendant's contention that Felton Lorio was armed and that someone else fired the first shot. The forensic evidence shows that all eight shots were from the Defendant's gun. There were no other shell casings found. When the trier-of-fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. State v. Jiron, 96-319 (La. *172 App. 5th Cir. 10/1/96), 683 So.2d 769, 771; State ex rel. Graffagnino v. King, 436 So.2d 559, 563 (La.1983). It is not the function of the appellate court to assess the credibility of witnesses or re-weigh the evidence. State v. Styles, 96-897 (La.App. 5th Cir. 3/25/97), 692 So.2d 1222, 1233, writ denied, 97-1069 (La.10/13/97), 703 So.2d 609; King, 436 So.2d at 563. Considering these factors and the evidence, we find that the State proved beyond a reasonable doubt that the Defendant did not shoot the victim in self-defense. Furthermore, viewing the evidence in the light most favorable to the prosecution, we find that the State proved the elements of the offense beyond a reasonable doubt.
In Defendant's second assignment of error, he contends that the trial judge erred in allowing testimony of the robbery against Robert into the proceedings when the State admitted that the Defendant was not a participant therein. The Defendant argues that the testimony concerning the theft of the gold necklace was inadmissible because it was evidence of other crimes. The State responds that the evidence is not of other crimes because the robbery was not committed by the Defendant. The State further argues that the evidence is admissible as res gestae evidence or that the admission of the evidence, if an error, is harmless.
La.C.E. art. 404B provides in part:
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
It was undisputed at trial that the Defendant was not part of the robbery that took place two days before the Gretna Green fight. La.C.E. art. 404B applies to "other crimes" committed by the Defendant. Thus, it is inapplicable to the robbery evidence. Furthermore, the res gestae exception, codified in La.C.E. art. 404B.1, is not applicable for the same reason. The issue is whether the evidence was relevant and, if so, whether its probative value outweighed the danger of unfair prejudice, confusion of the issues, being misleading, or undue delay. La.C.E. art. 403.
In this case, the evidence was relevant only to show the reason for the fight in Gretna Green park. However, it was not relevant to the guilt or innocence of the Defendant. Nonetheless, the admission of the evidence was not prejudicial. There was no dispute that the Defendant shot the victim eight times. Further, the Defendant's own version of the events supports his conviction. He was the "aggressor" in this case. Thus, the introduction of the evidence, even if it was inadmissible, was harmless error. See: La.C.Cr.P. 921.

ERROR PATENT
The record was reviewed for errors patent, pursuant to La.C.Cr.P. art. 920. The review reveals no errors patent in this case.
Accordingly, Defendant's conviction and sentence are hereby affirmed.
AFFIRMED.