788 So.2d 565 (2001)
STATE of Louisiana
v.
Michael LOVICK.
No. 00-KA-1833.
Court of Appeal of Louisiana, Fifth Circuit.
May 16, 2001.
*567 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Churita H. Hansell, Allison Monahan, Ron Austin, Gregory Kennedy, Assistant District Attorneys, Gretna, LA, Attorneys for Plaintiff/Appellee.
J. Rodney Baum, Louisiana Appellate Project, Baton Rouge, LA, Attorney for Defendant/Appellant.
Panel composed of Judges SOL GOTHARD, CLARENCE E. McMANUS and JAMES C. GULOTTA, Pro Tem.
GOTHARD, Judge.
The defendant, Michael Lovick, along with Johnas Durall, was charged by grand jury indictment with first degree murder in violation of La. R.S. 14:30. Thereafter, on defendant's motion, the cases were severed for trial. Defendant was convicted of second degree murder, and sentenced to the mandatory penalty of life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence. Defendant now appeals. We affirm defendant's conviction and sentence.

FACTS
At the trial of this matter, the state's primary witness at trial was Johnas Durall (a/k/a "Little John").
Durall testified that on the night of May 5, 1998, he was in the Tallow Tree area of Harvey, visiting with friends and acquaintances who lived in that neighborhood. He stated that he and defendant went to the home of someone named Kiean. Kim White testified that she saw defendant and Durall there. She observed Durall and defendant attempting to reach Mark Willis by telephone. Durall told Ms. White that he and defendant were trying to reach Willis in order to "score" something (i.e., buy drugs). Ms. White saw defendant and Durall leave the party together.
After leaving Kiean's party, Durall and defendant went to a nearby dice game. They then went to the home of Peggy Johnson (a/k/a Peggy Lee). Ms. Johnson testified that she lived at that time on Tallow Tree Street with her daughters, Lolitha Loeb, Artrell White and Kim White, as well as her grandchildren. Defendant, the father of Artrell White's child, was a frequent guest at Ms. Johnson's home; he was treated as one of the family, and was allowed to come and go as he pleased.
Durall testified that when he and defendant arrived at Ms. Johnson's home, he waited outside while defendant went into the apartment to retrieve some clothes. Kim White, having returned home by that time, saw Durall waiting for defendant in front of the apartment. She testified that she had in the past seen Durall when he was under the influence of drugs. He seemed to her to be "on something" that night. Durall himself testified that he used heroin and marijuana on the day of the incident.
Ms. Loeb, who was home at the time, testified that when defendant came inside the apartment, he asked her about a black hood of her brother's. She told him her brother had taken his clothes to his girlfriend's house, but nonetheless went upstairs with him to look for the requested hood. Durall stated that he saw defendant throw a pillowcase containing some black clothing out of a second-floor window. When defendant then returned downstairs, Ms. Loeb asked him if he was going to mess with "that guy," meaning Mark Willis. Defendant replied that he would not. Loeb said she asked the question because Willis was known in the neighborhood to have a great deal of money and drugs. *568 Ms. Loeb testified that after defendant left the house, she saw him on the patio doing something with dark clothes.
Defendant exited Ms. Johnson's house, and he and Durall walked together to a nearby alley. Durall testified that he watched while defendant put on the black clothing from Ms. Johnson's house and covered his face with a sweater. Durall testified that defendant's actions led him to believe defendant intended to rob Mark Willis.
Demetress Walker, Willis' live-in girlfriend, testified that Willis was a drug dealer, and that he kept drugs and money in their home in the Tallow Tree Apartments. Durall testified that he and Willis were friends, and that he had met with Willis at around 10:00 that night. Durall further testified that he and defendant were at Ms. Johnson's home some time between 11:00 p.m. and midnight.
After defendant changed clothes in the alley, he asked Durall to knock on Willis' door for him. According to Durall, this was the first time defendant spoke about what he planned to do. When Durall refused, defendant pulled a .9mm automatic handgun from his pants, and "looked at him funny." Frightened by defendant's actions and demeanor, Durall walked with him to Willis' apartment.
When the two men arrived at Willis' apartment, Durall knocked on the door, then rang the bell to assure he was heard. Durall testified that he heard Willis walking down the steps inside the apartment. Durall then ran to the nearby home of his friend Michael Fluger. He testified that as he ran he heard one gunshot. Once inside Fluger's home, he heard about six more gunshots. Kim White testified that she was watching the dice game near Fluger's house when she saw Durall running from the direction of Willis' house. Seconds later she heard the sound of gunfire.
Demetress Walker testified that she and a neighbor's child, Dottie, were on the second floor of the apartment when she heard a knock at the door. It was about 11:00 p.m. She testified that Willis answered the door. He had prepared a bag of cocaine for a pre-arranged sale, and he carried it with him. Ms. Walker heard someone ask Willis where the dope was. She then heard gunshots, and she and Dottie hid in a closet. Ms. Walker heard about nine gunshots in all. She went downstairs to find Willis lying in a pool of blood. She telephoned police, as did a neighbor. Ms. Walker then concentrated her efforts on getting Willis' drugs and money (about ten thousand dollars) out of the apartment before police officers arrived. She testified that she gave the contraband to a neighbor.
A crowd gathered at the scene after the shooting. Ms. White went inside Willis' apartment upon hearing the gunfire. She saw Willis slumped against a sofa in the front room of the apartment. She checked for a pulse, but found that Willis was dead. Ms. Johnson testified that she was at her apartment when defendant arrived and told her someone had been shooting at him. Ms. White returned to her mother's house to report what had happened and saw defendant there. At that point, Ms. Loeb left the house and went to the murder scene, which was three buildings away. When she returned home, upset and in tears, defendant was still there. He told her it was going to be alright; that he had to do what he did because Mark was going to get him. Ms. Johnson told defendant he had to leave her house, because she feared someone might be "gunning" for him, and she wished to protect her family. A short time later, someone in a car stopped in front of the house, and defendant got into the car and left.
*569 Deputy Michael Kinler of the Jefferson Parish Sheriffs Office testified that he received a radio call concerning a shooting in the Tallow Tree area around midnight on May 5, 1998. He arrived at the scene five minutes later to find the victim had died. Kinler alerted the detective bureau and emergency medical personnel, and secured the crime scene. That was the extent of his involvement in the case. A crime scene technician collected evidence and took photographs at the scene. Ralph Sacks was the detective assigned to the case.
Dr. Fraser Mackenzie performed an autopsy on the victim for the Jefferson Parish Coroner's Office. He testified that a total of eight gunshots entered the victim's body, and that there was also one grazing wound. The doctor used autopsy photographs to point out blackening around one of the wounds caused by soot and gasses from the bullet cartridge. He stated the discoloration indicated the shot had been fired at very close range. Mackenzie testified that defendant suffered three fatal wounds. One was a shot to the head that severed the brain stem. A second was a shot to the chest that went through the victim's lung and caused severe internal bleeding. A third was a shot to the neck which lacerated the carotid artery. Dr. Mackenzie testified that he recovered some projectiles from the body, which he turned over to a crime scene technician at the time of the autopsy.
Firearms expert Louise Waltzer of the Jefferson Parish Crime Laboratory testified that she was given numerous spent bullet casings and pellets collected from the scene in this case for testing and analysis. She was able to determine that the pellets, or projectiles, were all of the .38 caliber class, which includes .9mm. She could tell that all of the pellets were fired from the same gun. Waltzer was also able to determine that the spent bullet casings were all .9mm, and were all fired from the same weapon. However, she was not given a weapon to test, and was therefore unable to determine conclusively that the pellets and the casings were fired from the same gun.

ALLEGATIONS OF ERROR
In his first assignment of error, defendant alleges that he was prejudiced by the prosecution's use at trial of statements he allegedly made to Johnas Durall in prison, as he was not informed of those statements during pre-trial discovery. Defendant refers to testimony elicited by the state from Durall regarding a letter Durall wrote while in jail awaiting trial.
In response to questioning by the prosecutor, Durall testified that he wrote the letter "for Mike," and that it was intended to go to his (Durall's) friend, Stafford Boling (a/k/a, Van). Durall further stated that defendant "told me what to write and I wrote it down." He testified that the letter said something to the effect that he was paid by someone to implicate defendant in Mark Willis' murder.
Defense counsel objected at the mention of defendant's involvement with the letter, arguing this was the first he had heard about it. The prosecutor stated that the defendant had been informed of the letter while in chambers. Defense counsel responded that he had not received any notice of statements made by the witness that defendant told him to write the letter. The prosecutor conceded that such notification was not contained in any pleading, but stated that the matter was discussed among the attorneys in chambers. The prosecutor further argued that the testimony at issue was not inculpatory.
Defense counsel argued that he was aware prior to trial that there was a note, and that Durall claimed not to have written *570 it. Counsel's objection was to the state's failure to inform him Durall would testify that defendant forced him to write the letter. The prosecutor stated that he had in fact previously informed defense counsel about defendant's alleged involvement with the letter. The trial judge overruled defendant's objection, noting that defense counsel would have the opportunity to cross-examine Durall regarding the letter.
Defendant argues to this court that the state failed to comply with the discovery requirements set forth in LSA-C.Cr.P. art. 716 B:
Upon motion of the defendant, the court shall order the district attorney to inform the defendant of the existence, but not the contents, of any oral confession or statement of any nature, made by the defendant, which the district attorney intends to offer in evidence at the trial, with the information as to when, where and to whom such oral confession or statement was made.
Defendant further claims that the state violated article 721, which provides:
Upon motion of the defendant, the court shall order the district attorney to inform the defendant of the state's intent to use statements of coconspirators pursuant to Louisiana Code of Evidence Article 801(d)(3)(b).
In item 26 of his pre-trial discovery motion, the defense did in fact ask the state for information regarding any oral or written statements made by defendant. In its responses to the discovery motion, the state made no mention of any statements regarding the letter written by Johnas Durall. However, the testimony elicited from Durall with respect to the letter did not include a "statement" by defendant as contemplated by article 716 B. Durall testified that Mike [defendant] "had a [piece of] paper and pencil and was telling me what to write and I was writing it down." Thus, the testimony elicited by the state described the actions of defendant, but not anything he specifically said.
Furthermore, we note that although the letter at issue was not admitted as evidence at trial, the record shows that the defense had a copy of it prior to trial. Therefore, there is no support for defendant's claim that the state failed to comply with LSA C.Cr.P. art. 722.[1]
We further find that the defendant failed to seek an appropriate remedy in the trial court. The record does not show that defense counsel moved for a mistrial, a continuance or any of the other remedies as set forth in La.C.Cr.P. art. 729.5.[2]
Although defendant asserts that his attorney moved the trial court to suppress the testimony concerning the letter, counsel did not specifically ask for such relief. If the defendant did not avail himself of the remedies available to him in the district *571 court, he effectively waived his right to raise the issue on appeal. See, State v. Quimby, 419 So.2d 951, 958 (La.1982).
Finally, defendant has failed to show that he was prejudiced by Durall's testimony about his involvement with the letter. This Court has held that admitting evidence without prior discovery under LSA C.Cr.P. art. 716 B will not constitute reversible error if harmless. See, State v. Rainey, 98-436, p. 8 (La.App. 5 Cir. 11/25/98), 722 So.2d 1097, 1101, writ denied, 98-3219 (La.5/7/99), 741 So.2d 28.
We find no merit in this assignment of error.
In defendant's second allegation of error, he contends that the evidence at trial was insufficient to prove he committed second degree murder. Defendant bases his argument primarily on the premise that Johnas Durall, a central witness for the state, was unreliable.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291; State v. Williams, 99-223 (La.App. 5 Cir. 6/30/99), 742 So.2d 604.
Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Williams, supra. When circumstantial evidence is used to prove a case, the trial judge must instruct the jury that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438. A different test is applied on appellate review.
The Louisiana Supreme Court recently commented:
On appeal, the reviewing court "does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events." State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, 1020. Rather, the court must evaluate the evidence in a light most favorable to the state and determine whether the possible alternative is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. Id.

State v. Mitchell, 99-3342, p. 7 (La.10/17/00), 772 So.2d 78, 83. Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); State v. Rogers, 99-1378 (La.App. 5 Cir. 11/28/00), 772 So.2d 960.
To prove a second degree murder, the state must show the killing of a human being and that the defendant had the specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1 A(1). Second degree murder is also defined as the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, including armed robbery. La. R.S. 14:30.1 A(2)(a).
Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to *572 follow his act or failure to act." La. R.S. 14:10(1). It may be inferred from the circumstances and actions of the accused. The intent to kill or inflict great bodily harm may be inferred from the extent and severity of the victim's injuries. State v. Keating, 00-51 (La.App. 5 Cir. 10/19/00), 772 So.2d 740. This Court has held that specific intent to commit second degree murder may be inferred from the pointing of a gun at close range and pulling the trigger. State v. Lewis, 00-80, p. 13 (La. App. 5 Cir. 5/30/00), 764 So.2d 164, 171.
Encompassed in proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. When the key issue in the case is identification, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Zeno, 99-69, p. 9 (La.App. 5 Cir. 8/31/99), 742 So.2d 699, 706.
Defendant asserts that the only evidence against him was the "uncorroborated" testimony of Johnas Durall, and that Durall's testimony was not sufficiently credible to support a conviction. Durall testified that he had already pled guilty to manslaughter in this case, and had been promised a 15 year sentence if he testified truthfully at defendant's trial. Durall further testified that he had a 1997 conviction for distribution of cocaine. At the time of the murder, Durall was a member of a gang. All of these factors, defendant argues, negate the credibility of Durall's testimony.
Defendant further contends that the testimony of the state's remaining witnesses was vague and contradictory, and did not correspond with Durall's testimony.
A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the fact finding function of the jury only to the extent necessary to assure the Jackson standard of review. It is not the function of an appellate court to assess credibility or reweigh the evidence. State v. Lockett, 00-859 (La.App. 5 Cir. 11/28/00), 775 So.2d 1086.
The state produced strong circumstantial evidence that defendant committed specific intent second degree murder. Kim White testified that defendant and Durall were at a party shortly before the murder, trying to reach the victim on the telephone. There was no eyewitness to Mark Willis' murder, and of all the witnesses at trial, Johnas Durall was in the best position to know about defendant's actions on the night of the shooting. Durall's testimony placed defendant at the victim's front door just moments before the shooting took place. Durall testified that defendant had a .9mm handgun, and firearms expert Louise Waltzer testified that the spent bullet casings found at the scene of the murder were all .9mm.
Other witnesses testified to having seen defendant in the vicinity of the victim's apartment both before and after the shooting. Johnas Durall, who had been seen with defendant at various times that evening, was seen running from the scene as the shots were fired. Defendant made an admission of guilt to Lolitha Loeb. He showed up at Durall's house the day after the murder to ask if Durall had told anyone about what had happened. There is also Durall's statement to Kim White two days after the murder that defendant was not supposed to kill Mark Willis; that the plan was simply to get drugs. In addition, there is Durall's testimony that defendant used subtle coercion to induce him to write a letter absolving defendant of guilt.
*573 There is also strong evidence of specific intent to kill or inflict great bodily harm. Dr. Fraser Mackenzie testified that a total of eight gunshot wounds entered the victim's body; three of them were fatal wounds. The doctor further testified that blackening around one of the wounds indicated the shot was fired at close range.
Defendant's actions leading up to the shooting show that he planned the incident. Ms. White overheard defendant at Kiean's party urging Durall to get in touch with Willis, and to assist him in what he had planned. Defendant dressed in black clothing and covered his face. He pulled his gun from his pants before arriving at the victim's apartment. He essentially forced Durall to participate in the act, making advance plans with Durall. After the shooting, he told Ms. Loeb that he had to do what he did to Mark Willis.
Based on the evidence presented at trial, a rational trier of fact could have found that the state proved, beyond reasonable doubt, that defendant shot Mark Willis, and that he had the specific intent to kill or inflict great bodily harm at the time of the shooting. Accordingly, we find that there was sufficient evidence to support defendant's conviction for second degree murder.
In his third allegation of error, defendant complains that the life sentence imposed, although mandated by law, was excessive, as the trial court failed to utilize the provisions of LSA C.Cr.P. art. 894.1 to particularize the sentence to the facts of the case.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. State v. Lobato, 603 So.2d 739 (La.1992); State v. Munoz, 575 So.2d 848 (La.App. 5 Cir.1991), writ denied, 577 So.2d 1009 (La.1991).
Louisiana courts have consistently held that a mandatory sentence of life imprisonment for second degree murder does not constitute cruel and unusual punishment. State v. Graham, 422 So.2d 123 (La.1982), appeal dismissed, Graham v. Louisiana, 461 U.S. 950, 103 S.Ct. 2419, 77 L.Ed.2d 1309 (1983); State v. Pendelton, 96-367 (La.App. 5 Cir. 5/28/97), 696 So.2d 144, writ denied, 97-1714 (La.12/19/97), 706 So.2d 450; State v. Hill, 98-1087 (La.App. 5 Cir. 8/31/99), 742 So.2d 690, writ denied, 99-2848 (La.3/24/00), 758 So.2d 147.
Furthermore, we see no error in any failure of the trial court to give reasons for the sentence imposed. Failing to articulate reasons for the sentence as set forth in La.C.Cr.P. art. 894.1, when imposing a mandatory life sentence is not error. The court has no discretion in imposing a mandatory life sentence and therefore setting forth the factors considered in imposing sentence would be an exercise in futility. State v. Stone, 33-383 (La.App. 2 Cir. 5/15/00), 758 So.2d 997.
Defendant cites this court to the case of State v. Dorthey, 623 So.2d 1276 (La.1993). Dorthey recognized that an enhanced minimum sentence imposed pursuant to the multiple offender statutes may be constitutionally excessive. See also State v. Johnson, 97-1906, pp. 6-8 (La.3/4/98), 709 So.2d 672, 674-77. Defendant's sentence does not fall within this category. In addition, defendant has failed to show by clear and convincing evidence that his particular circumstances are an exception to the constitutional application of the mandatory sentence. State v. Johnson, supra.
*574 We find no merit to defendant's allegation that his sentence is constitutionally excessive.
We have reviewed this record for errors patent pursuant to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals no patent errors in this case.

CONCLUSION
For the above discussed reasons, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] La.C.Cr.P. art. 722 provides:

Upon motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect and copy, photograph or otherwise reproduce any relevant written or recorded confessions or inculpatory statements made by a codefendant and intended for use at trial. Exculpatory evidence shall be produced under this article even though it is not intended for use at trial.
[2] La.C.Cr.P. art. 729.5 provides:

A. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this Chapter or with an order issued pursuant to this Chapter, the court may order such party to permit the discovery or inspection, grant a continuance, order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate.