811 So.2d 1071 (2002)
STATE of Louisiana
v.
Douglas CASSARD.
No. 01-KA-931.
Court of Appeal of Louisiana, Fifth Circuit.
February 26, 2002.
*1072 Kevin V. Boshea, Williams, Boshea & Ehle, New Orleans, LA, for Douglas Cassard, Defendant-Appellant.
Paul D. Connick, Jr., District Attorney, 24th Judicial District Court, Terry M. *1073 Boudreaux, Thomas J. Butler, Assistant District Attorneys-Appellate Counsel, Richard J. Pickens, II, Assistant District Attorneys-Trial Counsel, Gretna, LA, for State of Louisiana, Plaintiff-Appellee.
Panel composed of Judges JAMES L. CANNELLA, MARION F. EDWARDS and SUSAN M. CHEHARDY.
CHEHARDY, Judge.
On February 28, 2000, the Jefferson Parish grand jury indicted the defendant, Douglas Cassard, on one count of second degree murder, a violation of La. R.S. 14:30.1, for the murder of Allen Cooper. On March 1, 2000, the defendant was arraigned and entered a plea of not guilty.
On March 9, 2000, defendant filed omnibus pre-trial motions, including a motion to suppress confession. On May 12, 2000, defendant filed a motion to suppress statements. After a hearing on June 19, 2000, these motions were denied. Further, on July 14, 2000, after a hearing on the State's motion in limine to exclude evidence of the victim's bad character and prior threats, the trial judge ruled that witness testimony of specific threats or violent acts by the victim toward the defendant were admissible as res gestae.
On December 4, 2000, the trial court heard and denied the defendant's motion to suppress the search warrant. Later that day, the jury was selected and sworn. Trial began on December 5, 2000. On December 6, 2000, by a vote of 10-2, the jury found the defendant guilty as charged.
On March 1, 2001, the defendant filed a motion in arrest of judgment and a motion for new trial, which the trial court heard and denied on March 2, 2001. That same day, the defendant waived sentencing delays, and the trial court sentenced the defendant to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence. That day, the defendant filed a motion for appeal, which was granted. On March 30, 2001, the defendant filed a motion to reconsider sentence, which the trial court denied on April 27, 2001.

Facts
The defendant in this case purchased illegal narcotics from the victim on more than one occasion. On the evening of January 6, 2000, the defendant received a call from the victim, who said he was in a bind and needed money. The defendant replied that all he could give him was money, approximately $1000.00, that he already owed him.
The victim called again later asking for the defendant's help and asking to see him. According to the defendant, during that telephone call, the victim indicated that if the defendant did not help him he would "kick his ass." The defendant then left his apartment with a man named David Ostendorf ("Ostendorf") to sell some cocaine to Ostendorf's friend so that the defendant could get the money to pay the victim. Later, they dropped off a triple beam balance scale used to measure drugs at the defendant's apartment.
Later that evening, the defendant and Ostendorf and two other men, Ricky LeBlanc ("LeBlanc") and Ellis Case ("Case"), went to meet Mark Huerta ("Huerta") at the Louisiana Pizza Kitchen between ten and eleven p.m., when Huerta was getting off of work. After LeBlanc, Case and Ostendorf snorted cocaine in the parking lot at the Pizza Kitchen, LeBlanc and Case left the Pizza Kitchen to get hamburgers *1074 at Burger King. The defendant and Ostendorf followed Huerta to his house so that he could change clothes. All five of the men planned to meet at Huerta's house to go out later that night.
While the defendant and Ostendorf were waiting for Huerta to change, Huerta came outside, got into the defendant's car, and told the defendant that his girlfriend, Sabrina Hopstetter, had just called for him. Huerta reported that Sabrina was very upset because the victim had recently called her house and threatened to come over to her house to beat her and the couple's baby. After the defendant spoke with Sabrina, he became very angry. When the defendant settled down, he asked Ostendorf to "back him up" if there was fight between him and the victim.
When LeBlanc and Case arrived at Huerta's house, the other three men were not there. When LeBlanc called Huerta's cell phone, the defendant answered and told LeBlanc to "hang tight" because the defendant, Huerta and Ostendorf had to "handle some business."
Because the defendant was very upset concerning the threats, he testified that he tried to avoid meeting with the victim that night. But later he agreed to meet the victim after the victim stated that if the defendant did not meet with him that night the victim would "kick his ass." The two men initially decided to meet at the Amoco station on Manhattan Boulevard and 8th Street. But after arriving at the Amoco station and discovering it was unsuitable for their meeting, the defendant and the victim agreed to meet at "J-Dog's" house, which was also the victim's residence at that time.
The defendant was the first to arrive at J-Dog's house. He parked his car in front of the house but kept the motor running. The victim arrived and pulled up beside the defendant's car so that the two cars were facing opposite directions with the driver's windows next to each other. The victim asked the defendant if he had the money, to which he responded that he did. The victim then began talking about "the Cubans" who had threatened him earlier in the day but the conversation was still casual.
During this conversation, the victim tried to sell the defendant more drugs because he needed more money but the defendant refused. The victim became more aggressive and insisted that the defendant buy the drugs or he would "whip his ass." The defendant stated that the victim told him, "If you don't help me, you can call your old lady and ask her what will happen. Wait til you hear what I told your old lady I was going to do."
At that point, the defendant freaked out, pointed a gun at the victim, and yelled, "Don't you ever threaten me or my f_____ family again. If you do, I'll shoot you in your face. You worried about the Cubans, you'd be worrying about me." Eyewitnesses both stated that the victim made a defensive motion backward when the defendant pointed the gun at him.
Both eyewitnesses also testified that the victim then leaned forward and said with a grin on his face, "you just put a gun in my face, I'm Allen f_____g Cooper." The defendant replied, "Yes, I did b_____!" and then shot the victim with at point blank range with a .38 caliber pistol.
At trial, the defendant testified that the victim leaned forward on his window and he thought the victim was coming toward him. Further, the defendant claimed that the victim had to have a gun on him and *1075 that one of his hands was out of sight. Finally, the defendant testified that he thought the victim had a gun to protect his drugs and money but he did not see a gun that night. He believed, however, that the victim was going for a gun and, therefore, he shot him.
At trial, Ostendorf corroborated the defendant's statement that the victim's right hand was out of sight during the argument but refuted the defendant's statement that the victim's movement toward the car window was intimidating. Ostendorf also testified that the defendant told him that he had a gun with him because of the victim's reputation and that sometimes things get "shady."
After the shooting, the defendant drove off, and the three men discussed what they should do with the gun. Huerta wiped the gun to remove fingerprints. Ostendorf threw the magazine clip out the car window on a street near the Huey P. Long bridge then, while they were driving over the Huey P. Long Bridge, he threw the gun out of the car window into the Mississippi River. The three went to the defendant's apartment on the Eastbank. When he arrived home, he told Sabrina not to worry about the victim anymore because "it was taken care of."
That night, Detective Donald Meunier of the Jefferson Parish Sheriff's Office responded to a report of a shooting in the 500 block of Chalmette Street in Harvey. When he arrived, Meunier found the victim, who was dead, in a blue Honda Accord with a single gunshot wound between the eyes. On the ground outside the car, he found one casing from a .38 caliber bullet.
Although he did not find a weapon in the victim's car, Detective Meunier found a beeper and a cell phone. When he accessed the phone records of the cell phone, he found the defendant's home telephone number and Heurta's telephone number. During the investigation, Detective Meunier learned that the victim had "cut" three ounces of cocaine on the night of the murder, that the victim was known to carry guns, and that the defendant was threatened by the victim on the day of the murder.
Further investigation led to the issuance of arrest warrants for the defendant and Heurta. After their arrests, the police took statements from the defendant and Huerta. As a result of those statements, Ostendorf was also implicated. Huerta was originally charged with principal to second degree murder but, in exchange for his testimony against the defendant, that charge was reduced to accessory after the fact.
Detective Meunier took four statements from the defendant on January 10, 2001. At trial, the audiotapes of defendant's statements were played for the jury. Sergeant Grey Thurman of the Jefferson Parish Sheriff's Office testified that, on January 10, 2000, he executed a search warrant for the defendant's residence. During the search, he seized items including: a cigar box with two portions of rolling paper partially burned, scissors, plastic baggies, a pack of zig-zag rolling paper, multi-colored pipe, cell phone, pager, two portable scales, cigarette lighters, a razor blade, small plastic or glass tubing with a white residue on the interior and a "bong" or water pipe. Sgt. Thurman testified that, in his experience, the seized items were consistent with drug paraphernalia. On cross-examination, Thurman admitted that the items had not been tested or analyzed to determine the chemical content.
*1076 Dr. Susan Garcia, an expert in forensic pathology, testified that the victim died of a single gunshot wound to the head. Further, the stippling pattern of the wound indicated that the muzzle of the killer's gun was within three to eleven inches of the victim's head. Dr. Garcia also found Valium, cocaine, marijuana, dextromethorphan (cough medicine), chlorpheniramine (cold medicine) and caffeine in the victim's system.

Discussion
In his first three assignments of error, defendant argues that the verdict is contrary to the law and the evidence, that the trial court erred in the denial of the motion for new trial and that the trial court erred in the denial of the post-verdict motion in arrest of judgment. Because these assignments of error concern the sufficiency of the evidence, we will address them together.
The defendant contends that the evidence was insufficient to sustain a conviction of second degree murder because the State failed to prove beyond a reasonable doubt that he did not act in self-defense. The defendant also argues alternatively that the verdict was contrary to the law and the evidence, and at best, proved that the defendant was guilty of manslaughter.
The constitutional standard for testing the sufficiency of the evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Mussall, 523 So.2d 1305 (La.1988).
Under Jackson, a review of a criminal conviction record for sufficiency of evidence does not require a court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. A reviewing court is required to consider the whole record and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. State v. Lapell, 00-1056 (La.App. 5 Cir. 12/13/00), 777 So.2d 541, 545. It does not "serve as a vehicle for a reviewing court to second guess the rational credibility determinations of the fact finder at trial." State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291, 1293.
The defendant in this case was charged with second degree murder. La. R.S. 14:30.1(A) states that, "Second degree murder is the killing of a human being: When the offender has a specific intent to kill or to inflict great bodily harm...."
In this case, the defendant concedes that he shot and killed the victim but contends that the shooting was committed in self-defense. Self-defense is defined in LSA-R.S. 14:20, which states, in part:
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
When a defendant claims self-defense, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. The relevant inquiry on appeal is whether a rational fact finder, after viewing the evidence in the light most favorable to the prosecution, could have found, beyond a reasonable doubt, that the homicide was not committed in self-defense.
The determination of a defendant's culpability focuses on a two-fold inquiry, *1077 (1) whether, from the facts presented, defendant could reasonably have believed his life to be in imminent danger, and (2) whether deadly force was necessary to prevent the danger. While there is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a defendant had a reasonable belief that deadly force was necessary to avoid the danger. State v. Cazenave, 00-183 (La.App. 5 Cir. 10/31/00), 772 So.2d 854, 860.
The defendant in this case contends that he shot the victim in self-defense because he thought that the victim was going for a gun. He contends that the victim often carried a gun and that he thought his life and his family's life was in danger. The State responds that there was no imminent danger nor was deadly force necessary to avoid danger.
At trial, there was testimony that the victim sold guns as well as drugs. In fact, it is uncontroverted that the defendant purchased the gun used to murder the victim from the victim. LeBlanc, a long-time friend of the victim's, testified that, at times, the victim did carry a gun. Huerta testified, however, that he had never seen the victim point a gun at someone in a serious manner. Further, the defendant admitted that he did not see a gun when he was arguing with the victim that night on Chalmette Street.
Moreover, although the defendant and Ostendorf both testified that, when the victim was seated in his car during the argument, his right hand was not visible, Huerta and Ostendorf both testified that the victim did not make any intimidating or aggressive movement indicating that he was reaching for a gun. Ostendorf described the encounter as "the victim calling a bluff" when the victim moved forward putting his hands on the door. Both Ostendorf and Huerta stated that the defendant was the aggressor when he pointed the gun and began yelling at the victim. Importantly, the defendant did not indicate to the police in any of his four statements that he thought the victim was going for a gun.
Finally, the possibility of escape is a recognized factor, and the record indicates that the defendant could have given the money to the victim and left. If the defendant thought imminent danger to him was afoot, his car, with its engine running, was very close to him, which could have provided a means of escape.
When the trier-of-fact is confronted by conflicting testimony, the determination of that fact rests solely with the judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. State ex rel. Graffagnino v. King, 436 So.2d 559, 563 (La.1983). It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence. Id.
In this case, the jury was confronted with conflicting testimony and chose to accept the testimony of Huerta and Ostendorf, eyewitnesses to the murder, while rejecting the defendant's claim of self-defense. It is not this Court's function to reweigh the jury's credibility determination on appeal.
In his appellate brief, the defendant argues that, even if the State met its burden of proof that the defendant did not act in self-defense, then the verdict of guilty of second degree murder is still contrary to the law and the evidence, and, at most supports the responsive verdict of *1078 manslaughter. The defendant specifically claims that the threats to his family, including his nine-month-old baby and the alleged habits of the victim, showed that the defendant acted in sudden passion or heat of blood. The State responds that the evidence supports the finding that the defendant had the specific intent to kill Allen Cooper, and this was the case of a drug deal that went bad.
To prove second degree murder, LSA-R.S. 14:30.1(A), the State must show (1) the killing of a human being and (2) that the defendant had the specific intent to kill or inflict great bodily harm. Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1).
Specific intent may be inferred from the circumstances and actions of the accused as well as from the extent and severity of the victim's injuries. State v. Keating, 00-51 (La.App. 5 Cir. 10/19/00), 772 So.2d 740. This Court has held that specific intent to commit second degree murder may be inferred from the pointing of a gun at close range and pulling the trigger. State v. Lewis, 00-80, p. 13 (La. App. 5 Cir. 5/30/00), 764 So.2d 164, 171.
In this case, the defendant shot the victim at close range. The defendant testified that, after initially pointing his gun at the victim, he retracted his gun until the victim stated, "You just put a gun in my face." Ostendorf testified that the defendant replied, "Yes, I did" and shot the victim. Ostendorf also testified that the defendant stated that "Al's f_____ dead!" while the three were still at Huerta's house.
The defendant argues that the threats to his family incited sudden passion or heat of blood. LeBlanc testified that the victim was a small guy and, although he bragged a lot, he never followed up on what he said. Based on the evidence presented, in the light most favorable to the prosecution, we find that a rational trier of fact could reasonably find that the defendant had the specific intent to kill the victim when he shot him in the head at close range.
Based on the foregoing evidence, we do not find that the verdict was contrary to the law and evidence, nor did the trial judge err in denying defendant's motion for new trial or post-verdict motion in arrest of judgment.
In his fourth assignment of error, the defendant contends that the trial court erred in admitting the drug paraphernalia seized during the search of his apartment because the sole use of the evidence was to portray the defendant as a "bad man." The State responds that introduction of the drug paraphernalia was necessary to reveal the connection between the victim and the defendant and its theory that the killing was a result of a drug deal gone bad. The State also sought to establish that this was not a case of a father protecting his child, as asserted by the defendant.
All relevant evidence is admissible at trial. LSA-C.E. art. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." LSA-C.E. art. 401.
Relevant evidence may be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, *1079 misleading the jury, considerations of undue delay, or waste of time. LSA-C.E. art. 403. The determination concerning relevancy of evidence is within the discretion of the trial judge whose rulings will not be disturbed in the absence of an abuse of discretion. State v. Winfrey, 97-427 (La.App. 5 Cir.10/28/97), 703 So.2d 63, 75, writ denied, 98-0264 (La.6/19/98), 719 So.2d 481.
On December 4, 2000, the court heard and denied the defendant's motion to suppress the seized evidence. The record reflects that the relationship between the defendant and the victim was predicated on the use and sale of drugs. It in uncontroverted that the defendant purchased drugs from the victim on several occasions in the past. Further, on the evening of the victim's murder, the defendant and Ostendorf dropped off a triple-beam scale, a piece of equipment commonly used to precisely measure drugs, at the defendant's apartment after selling some cocaine to a person to get the money needed to repay the victim. Here, the seized evidence demonstrated that the sale of drugs and money owed for drugs was the focal point of the encounter on January 6, 2000 between the defendant and the victim.
The defendant contends that the evidence in question consisted of marijuana and assorted marijuana paraphernalia. He claims that no evidence was presented that marijuana played a motive or role in the offense. At trial, it was not determined whether the drug paraphernalia pertained to cocaine or marijuana or both. Sergeant Grey Thurman, who seized the evidence from the defendant's apartment, only testified that the items were consistent with drug paraphernalia. We find the defendant's contention that the evidence was admitted solely to portray him as a "bad man" and drug abuser is without merit.
In his fifth and final assignment of error, the defendant claims that the trial court erred in denying the motion for mistrial when Detective Meunier stated his opinion that the victim's threats toward the defendant were "hollow threats." The defendant contends that this opinion testimony had a devastating effect on the jury because it implicated that the defendant's actions were without merit or any justification.
At trial, there were three specific comments regarding the victim's threats toward the defendant. First, the State asked Detective Meunier, "Were the threats real threats?" Meunier indicated the threats were not real. The defense objected and the trial court sustained that objection. Second, Detective Meunier later stated that the threats were hollow threats. The defense objected stating that Detective's Meunier's statement was an opinion and was not admissible. The trial court sustained the objection. Third, on direct examination, in the same line of questioning regarding what the investigation revealed about the victim's threats, Detective Meunier stated:
[H]e was a braggart at times and would speak but notwould not necessarily be taken as something that you would take literally. The statements he made about Doug Cassard were general. He wanted his money. And to use the term, "threat", it's a threat. But I mean, how seriously one takes it? That's the question. The investigation revealed perhaps he shouldn't have taken it so seriously.
The defense counsel objected, and the trial court sustained the objection and ordered *1080 that it be stricken from the record. The defense counsel then asked for an admonition and moved for a mistrial. The trial court denied the motion for mistrial. The trial judge did not find the remark prejudicial and did not admonish the jury.[1]
It is important to note that Detective Meunier's comments occurred on redirect examination by the State, where the prosecutor was following up on questions asked by defense counsel regarding the victim's threats. There is no indication in the record that the State purposely elicited Detective Meunier's remarks.
On appeal, the defendant argues that a mistrial should have been granted under La.C.Cr.P. art. 770. That article states:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
This Court has held that a policeman is not a "court official" and a mistrial under LSA-C.Cr.P. art. 770 is not required. Clearly, La.C.Cr.P. art. 770 does not apply.
The proper remedy, upon request of defendant, would be an admonition to the jury to disregard the remark. State v. Andrew J. Celestine, 98-1166 (La.App. 5 Cir. 3/30/99), 735 So.2d 109, 114, writ denied, 99-1217 (La.10/8/99), 750 So.2d 178. La.C.Cr.P. art. 771, entitled Admonition, states:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it *1081 is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
Mistrial is a drastic remedy and, except in instances in which mistrial is mandatory, is warranted only when trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial. State v. Forrest, 95-31 (La.App. 5 Cir. 2/14/96), 670 So.2d 1263, writ denied, 96-0654 (La.6/28/96), 675 So.2d 1117. Whether a mistrial should be granted is within the sound discretion of the trial court, and denial of a motion for mistrial will not be disturbed on appeal absent an abuse of that discretion. State v. Brown, 96-1002 (La.App. 5 Cir. 4/9/97), 694 So.2d 435, writ denied, 97-1310 (La.10/31/97), 703 So.2d 19.
Here, the trial judge heard the remarks and stood in the best position to assess its impact. The trial judge stated that she did not find the remarks to be prejudicial. We find that the trial court did not abuse its discretion in refusing to grant a mistrial.
Finally, our review of the record for errors patent pursuant to LSA-C.Cr.P. art. 920 reveals no errors patent requiring remand in this case. Based on the foregoing, we affirm the defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] At the post-trial hearing for the motion in arrest of judgment and the motion for new trial, the trial judge stated that she rarely gives an admonition because it brings attention to the evidence that is trying to be excluded. (R., p. 841).