866 So.2d 985 (2004)
STATE of Louisiana
v.
Laura EUGENE.
No. 03-KA-1128.
Court of Appeal of Louisiana, Fifth Circuit.
January 27, 2004.
*986 John M. Crum, Jr., District Attorney, Rodney A. Brignac, Assistant District Attorney, Edgard, LA, for Plaintiff-Appellee.
Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, LA, for Defendant-Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., SOL GOTHARD and JAMES L. CANNELLA.
*987 EDWARD A. DUFRESNE, JR., Chief Judge.
On October 18, 2000, the St. John the Baptist Parish Grand Jury issued a bill of indictment charging defendant, Laura Eugene, with second degree murder, a violation of LSA-R.S. 14:30.1. At the arraignment held on October 19, 2000, defendant pled not guilty.
On June 21, 2001, defendant filed a motion for mental examination, appointment of a sanity commission, and stay of prosecution. The trial judge appointed a sanity commission and thereafter conducted a competency hearing. After considering the reports of the doctors, the court found defendant incompetent to proceed to trial. Subsequently, in December of 2002, the court determined that defendant had regained competency to proceed to trial.
The matter proceeded to trial before a twelve person jury on January 14, 15 and 16, 2003. At the conclusion of trial, the jury returned a verdict of guilty as charged. Defendant filed a motion for new trial on January 24, 2003, which the judge denied. On February 10, 2003, the trial court sentenced defendant to a mandatory term of life imprisonment without benefit of parole, probation, or suspension of sentence. Defendant now appeals.

FACTS
At 1:00 a.m. on September 4, 2000, Fabriel Anderson and Veronica Nicholson were riding to Ms. Nicholson's home on Homewood Drive in Reserve. They had come from a Laplace nightclub called Weegie's. One of Ms. Nicholson's neighbors, Laura Eugene (defendant) flagged them down in front of 188 Homewood and asked them to help her. She said a car had fallen on her boyfriend. Ms. Nicholson testified that she had seen Ms. Eugene and her boyfriend earlier at Weegie's. Ms. Nicholson was not inclined to stop at defendant's house; she knew defendant and her companion often quarreled. Nevertheless, the women stopped to investigate.
Ms. Nicholson tried to call police on her cellular telephone. Ms. Anderson approached a car parked on the lawn, and did not see anyone under or near the vehicle. She did see defendant's boyfriend, David John Fluence, lying face down in the open doorway of the residence. The house was in disarray. Furniture and other items had been turned over, and a leg was missing from a table. A broken broomstick was lying near Mr. Fluence. Ms. Nicholson approached the house. Defendant told her that a car had fallen on Mr. Fluence. Ms. Nicholson asked how that could be, since Mr. Fluence was lying inside the house. Defendant said she did not know. Defendant later said an unknown person ran into the house, stabbed defendant, and escaped. Ms. Nicholson testified she did not see a knife at the scene.
Ms. Anderson and Ms. Nicholson helped defendant to turn Mr. Fluence onto his back. Ms. Nicholson testified that she saw a small amount of blood on Mr. Fluence and on the floor. Ms. Nicholson started chest compressions on Mr. Fluence, and asked defendant to breath into his mouth. Defendant walked around the house picking up items as if she were cleaning. Defendant eventually helped Ms. Nicholson perform CPR on Mr. Fluence. Ms. Nicholson showed defendant how to do it properly, but defendant failed to follow her direction. Eventually Mr. Fluence started to breathe.
Deputy Scott Maillet of the St. John the Baptist Parish Sheriff's Office testified that he was the first officer to arrive at the scene. He saw David Fluence lying in the doorway. He called for medical assistance, *988 and emergency medical personnel arrived shortly thereafter to transport the victim to a hospital.
Detective Todd Hymel testified that he arrived at the scene at 1:34 a.m. He observed smeared blood on the door's threshold, and a few drops of blood outside the door on a small concrete walkway. He learned defendant was a resident of the house. He looked around the interior of the house, and did not see anyone else there. He advised defendant of her rights, and told her he wished to speak to her about what had happened. She responded that she understood her rights, and was willing to waive them and answer Hymel's questions without the assistance of a lawyer.
Defendant told the detective that she and Mr. Fluence returned home from an evening at Weegie's. When Mr. Fluence got to the door, he told her he had been stabbed at the bar. He then collapsed. Detective Hymel testified that Weegie's is approximately five miles away from defendant's home.
The detective decided to question Ms. Anderson, Ms. Nicholson and defendant at his office. Sergeant Gary Cooper transported defendant to the Criminal Investigations Division of the sheriff's office. She had not been placed under arrest, nor was she handcuffed.
Detective Hymel placed the two witnesses and defendant each in a separate interview room. He questioned Ms. Anderson and Ms. Nicholson individually. He met with defendant alone at 3:14 a.m. By then, the detective knew that David Fluence had died. Hymel executed a waiver of rights form with defendant and thereafter took a taped statement which was admitted into evidence and played for the jury. In this statement, defendant told the officer that she and Fluence got into an argument when she accused him of cheating on her. According to defendant, Fluence broke a broom stick, slapped her face, and threw her into a chair. She then went into another room and armed herself with a knife to scare Fluence. During the course of the altercation, her hand slipped, and the knife went into Fluence.
Sergeant Michael Davis, a crime scene technician with the St. John the Baptist Parish Sheriff's Office, testified that he collected all the evidence at the scene. He found a Gerber black-handled knife with a three-quarter inch blade inside a purse. The purse was located in a bedroom closet. Sergeant Davis also found broken pieces of a broomstick in that closet.
Dr. Susan Garcia, an expert in forensic pathology, performed an autopsy on David Fluence's body. She testified that, in her opinion, the injury that led to Mr. Fluence's death was a single stab wound to the chest. Her examination showed that the knife went through part of the cartilage adjacent to the sternum. It entered the heart and caused bleeding into the sac that encloses the heart. Dr. Garcia surmised that the knife went four to five inches into the heart. Toxicology tests showed the victim's blood alcohol level measured .18, which is considered legally intoxicated under Louisiana's driving laws. The victim had a superficial cut above his right eyebrow and a small abrasion on the back of his right elbow.
Sharon Eugene, defendant's sister, testified for the defense. Ms. Eugene testified that three of defendant's five children were inside defendant's house at the time of the incident.[1] She arrived at the scene *989 shortly after 1:00 a.m., and saw Mr. Fluence lying in the doorway. She told Detective Hymel that she wanted to go into the house to retrieve the boys. He allowed her to do so.
Ms. Eugene testified that defendant and Mr. Fluence fought a great deal, although she did not know what they fought about. When they fought, the children would go to her house. Ms. Eugene testified that she had had occasion to call police to defendant's house in the past.
Dwayne Eugene Kennedy, defendant's thirteen-year-old son, testified that, at the time of the incident, he was in his bedroom in the Homewood Drive house. He heard defendant and Mr. Fluence arguing in the living room over a woman Fluence was secretly seeing. He got out of bed to use the bathroom, and heard Mr. Fluence push defendant against a wall. Dwayne testified that he had seen Mr. Fluence hit his mother on several occasions.
Dwayne saw defendant get a knife out of the kitchen and cut Mr. Fluence's face with it. He testified that he saw defendant holding a broom at one point. Dwayne looked again to see defendant holding the knife. Fluence did not have anything in his hand. Mr. Fluence ran at defendant. He did not see defendant actually stab Mr. Fluence, but he did see Fluence lying on the floor. Dwayne testified that police officers did not question him.
Brandon Jones, defendant's fourteen-year-old son, testified that, in the early morning hours of September 4, 2000, defendant and Fluence returned home after having been out together. The two began to argue. Brandon testified that defendant and Mr. Fluence fought constantly, and that defendant often asked Fluence to leave the house. Mr. Fluence always returned. Brandon testified that Mr. Fluence pushed defendant into walls, and slammed her into the living room table. Defendant retrieved a knife from the kitchen. Mr. Fluence hit her again. Brandon testified that he watched the altercation from the doorway of his bedroom. He could see the hallway, but not the living room. He testified that he did not see defendant stab Mr. Fluence, but he saw Mr. Fluence lying in the living room, face down. Brandon testified that he saw Mr. Fluence hit defendant with a broom during the course of the fight. Brandon stated he was in his room when police arrived, and they did not question him.
Defendant testified on her own behalf at trial. She stated that, on the evening of the incident, Mr. Fluence left her house at 5:00 p.m. He told defendant he was going to deliver some clothes to defendant's brother, Donald. Donald arrived at her house at 6:30 p.m. to ask where his clothes were, so she knew Fluence had lied to her about where he was going. Defendant testified that she left her house at 8:45 p.m., and went to Weegie's with her sister, Sharon, and Sharon's husband. She left three of her children at home with a babysitter. The other two were sleeping elsewhere.
Mr. Fluence arrived at Weegie's at 12:30 a.m. He and defendant left there together. Defendant testified that Mr. Fluence had been drinking, and he started an argument. He continued to yell at her when they got home. Defendant prepared herself to go to bed, and still defendant yelled at her. She left the bedroom, and defendant followed. He went into the kitchen and broke a broomstick. He slammed her onto the living room table and started choking her. She was unable to breathe. Defendant testified that she was able to free herself from Fluence's grasp, and she *990 went to the kitchen for a knife. Fluence ran towards her, and as a result, ran into the knife. He fell to the floor, then got up and went to the children's room. He then turned and walked back along the hallway. He fell towards the door. Defendant attempted to summon help.

ASSIGNMENT OF ERROR NUMBER ONE
In her first assigned error, defendant argues that the trial judge erred in failing to declare a mistrial when the jury informed him that it was deadlocked and could not reach a verdict. She complains that the court instead gave the jurors an improper instruction and insisted that they continue to deliberate.
The record shows that the jury began its deliberations at 2:35 p.m. on January 16, 2003. At 3:05 p.m., the jury sent the judge a written request for the tape of defendant's recorded police statement. The judge denied the request on grounds that the law prohibits jurors from examining such evidence during deliberations.
At 5:55 p.m., the jury sent the judge a second written note. The jury advised the court that it was deadlocked, and requested the court's guidance as to how to proceed. The judge stated:
The note tells me that the jury is right now deadlocked and that they are simply in need of guidance. Our proposition is that I will instruct them that in light of the effort that has gone onto the matter so far they must reapply themselves and deliberate a little harder and a little longer with an eye to reaching a just verdict. And I think I'm going to reread them a very, very short excerpt from our instructions, hoping that that will have some effect, hoping however slight....
When the judge asked the attorneys whether there was anything they wished to add, defendant's counsel responded, "Your Honor, I think you're taking the right approach." The judge had the jury brought into the courtroom and made the following comments:
In light of your note asking for a bit of guidance, I'm not going to tax you too much or insult you by reading to you a great deal, but I'm going to read you two paragraphs from my instruction hoping that I can tell you that you must each consider each other views; you must discuss the evidence fully with an objective to reaching a verdict. That's the important phrase here, that you must try to reach a just verdict. I know you understand now this is a very difficult proposition.
In light of the effort that has gone before, these two days and some number of months on both sides preparing for this matter, the time you spent so far, we'd like to ask you to spend a little more time, perhaps turning the issue on its head, thinking of some other approaches that you can obtain the result of a just verdict. It is only after that point if you remain deadlocked you'd have to talk to me once again in writing and I may have a different response. But at this time, it's been roughly three hours and some minutes that you've been at this task.
Again, I can't tell you how much we appreciate you being here and doing what you're doing. But at this time, I'm compelled to ask you once again to try to seek a fresh viewpoint, while not surrendering your own viewpoint but perhaps a fresh way of analyzing this. Maybe you can take a short break even to clear your heads a little bit. But I'm going to have to ask you to attempt this a little while longer. And that's the only response I can give you at this time to your letter. It may not be what you *991 want to hear, but it's what I must tell you. So I'm going to have to ask you to try once again. Thank you.
The jurors were sent to continue deliberations, and there was no objection to the judge's comments from either the prosecutor or defense counsel. Defendant now argues the trial judge erred in giving the jury a prohibited "Allen" charge after jurors declared they were deadlocked. We first note that defendant is not entitled to raise this issue, as she did not preserve it for appeal by making a contemporaneous objection, LSA-C.Cr.P. art. 841, or a timely motion for mistrial, LSA-C.Cr.P. art. 775.
Even assuming the issue is properly before this court, there is no merit to defendant's claim. In State v. Collor, 99-0175 (La.App. 4 Cir. 4/26/00), 762 So.2d 96, 104, writ denied, 00-1487 (La.3/9/01), 786 So.2d 116, the appellate court explained:
The Allen charge originated in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed.2d[L.Ed.] 528 (1896), where the United States Supreme Court approved a charge to break a jury deadlock and accomplish jury unanimity. However, the Louisiana Supreme Court has banned the use of the Allen charge, and subsequent modifications of it. State v. Nicholson, 315 So.2d 639 (La. 1975). While our Supreme Court recognized the authority of a trial court to give further instructions to a jury unable to agree upon a verdict, it found the Allen charge problematic for two reasons. First, the charge emphasizes that the jury has a duty to reach a verdict, implying that the trial judge will not accept a mistrial. Second, when the duty to reach a verdict is coupled with an admonition by the trial judge that those in the minority should rethink their position, there exists an almost overwhelming pressure to conform to the majority's view. State v. Campbell, 606 So.2d 38, 40 (La.App. 4 Cir.1992). Thus if a trial judge gives an Allen charge or any "coercive modification" of same, the trial court will have committed reversible error. Nicholson, supra.

First, the jury, in the present case, simply informed the judge that they had as yet been unable to reach a verdict, and that they wanted the court's guidance on how to proceed. There was no reason at that point for the judge to declare a mistrial. Secondly, the judge's charge regarding further deliberations did not touch upon the elements that the United States Supreme Court found problematic in Allen. It is unlikely that the jurors interpreted the judge's request that the jury spend "a little more time" deliberating as an implication that the court would not accept a mistrial. The jury did not arrive at a verdict until 9:23 p.m., more than three hours after the instruction at issue. Such a delay suggests that the jurors were not prompted to surrender their beliefs under pressure to arrive at a swift verdict. The judge, in fact, specifically told the jurors they should not surrender their own opinions.
Based on the foregoing discussion, we find that the trial judge did not err in failing to declare a mistrial when the jury informed him that it was deadlocked and could not reach a verdict. Thus, this assigned error is without merit.

ASSIGNMENT OF ERROR NUMBER TWO
By this assignment, defendant asserts that the evidence was insufficient to sustain a conviction for second degree murder because the state failed to prove beyond a reasonable doubt that she did not act in self-defense. LSA-R.S. 14:20 provides:
A homicide is justifiable:

*992 (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
When a defendant claims self-defense, the state must prove beyond a reasonable doubt that the defendant did not act in self-defense. The relevant inquiry on appeal is whether a rational fact finder, after viewing the evidence in the light most favorable to the prosecution, could have found, beyond a reasonable doubt, that the homicide was not committed in self-defense. State v. Cassard, 01-931 (La.App. 5 Cir. 2/26/02), 811 So.2d 1071, 1076, writ denied, 02-0917 (La.12/19/02), 833 So.2d 327.
The determination of a defendant's culpability focuses on a two-fold inquiry: (1) whether, from the facts presented, the defendant could reasonably have believed his life to be in imminent danger, and (2) whether deadly force was necessary to prevent the danger. While there is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a defendant had a reasonable belief that deadly force was necessary to avoid the danger. State v. Cassard, 811 So.2d at 1077.
Defendant cites, in support of her claim, testimony that she and Mr. Fluence fought routinely, that Mr. Fluence hit her often, and that Fluence attacked her on the morning of September 4, 2000, choking her until she lost consciousness. She also points to testimony that Mr. Fluence hit her with a broomstick, breaking it in the process. Defendant argues she was justified in arming herself with a kitchen knife and using it to stab Mr. Fluence.
Sharon Eugene, defendant's sister, testified that defendant and David Fluence fought often, and that she reported some of their altercations to police. Ms. Eugene was not, however, a witness to what happened at the house prior to the stabbing.
Defendant's son, Dwayne, testified that he has seen Fluence hit his mother's face on several occasions. Dwayne stated that, on the morning of September 4, 2000, he was on his way from his bedroom to the bathroom when he heard defendant and Fluence arguing. He heard banging noises that led him to believe Fluence was throwing defendant against a wall. Dwayne was not, however, in a position to see what was happening. He testified that he saw bruises on defendant's face on the morning of September 4, but he did not actually see Fluence hit defendant with his hand or with a broomstick.
Brandon, another of defendant's children, testified that he could not see what was happening in the living room during defendant's altercation with Fluence. At one point, Brandon saw Fluence enter the hallway with the broom and use it to hit defendant on her side. Fluence then dropped the broom and went back into the living room. Brandon did not see Fluence hit defendant in the face with the broom. When Brandon later saw Fluence lying on the living room floor, Fluence did not have anything in his hands.
Linda Allen testified that she is employed by Laplace Mobile Homes and that defendant has been a tenant of that company for ten to twelve years. Ms. Allen testified that, during the year 2000, she was called upon to arrange repairs for defendant's front door, which had been kicked in. On another occasion, there was a broken window, and there was an incident involving cut telephone wires. Ms. Allen went to defendant's home once to collect rent, and found defendant's face *993 beaten and bloody. Ms. Allen testified that she knew defendant was responsible for all of those incidents, as she saw the related police reports and heard calls for assistance over her police scanner. Ms. Allen did not, however, witness the altercation that led to the murder.
Donald Eugene, defendant's brother, testified that David Fluence was always hitting defendant. Mr. Eugene did not testify as to anything that happened on the morning of September 4, 2000.
The evidence tends to show Mr. Fluence had a history of abusive behavior. However, evidence that Mr. Fluence actually choked defendant on September 4, 2000, or in some other way posed an immediate threat of death or seriously bodily harm, is tenuous. There was testimony that furniture at the scene was in disarray. This arguably supports defendant's assertion that Fluence threw her against a table. However, Sergeant Michael Davis, the crime scene technician, testified that he did not observe any injuries on defendant's person when he saw her at the scene. Sergeant Gary Cooper, who transported defendant from the scene to the Criminal Investigations Division, testified that defendant was not bleeding, and that he did not see any injuries on her person.
Defendant testified that Mr. Fluence did not arm himself with a knife. Fabriel Anderson, one of the first witnesses at the scene, testified that she did not see anything (e.g., a weapon) in the victim's hands. Defendant was the only witness who testified that defendant choked her. Moreover, she testified that she was able to push Fluence away from her and go into the kitchen. At one point in her testimony, defendant said she feared for her life during the altercation. Nevertheless, she later characterized the stabbing not as an act of self-defense, but an accident.[2] She testified that Mr. Fluence ran into the knife as she held it.
Based on the foregoing evidence, rational jurors could have found, beyond a reasonable doubt, that the homicide was not committed in self-defense, and therefore, that defendant was guilty beyond a reasonable doubt. This assignment of error is likewise without merit.

ASSIGNMENT OF ERROR NUMBER THREE
In this assigned error, defendant challenges another aspect of the sufficiency of the evidence. She argues that, even if the state met its burden of proving she did not act in self-defense, the evidence at trial was insufficient to support a conviction for second degree murder. Defendant contends she acted in the heat of passion and with provocation, and therefore, at most, the state proved that she was guilty of manslaughter.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Ortiz, 96-1609, p. 12 (La.10/21/97), 701 So.2d 922, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); State v. Williams, 99-223 (La.App. 5 Cir. 6/30/99), 742 So.2d 604, 607.
*994 To prove second degree murder, the state must show (1) the killing of a human being, and (2) that the defendant had the specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1(A). Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Specific intent may be inferred from the circumstances and actions of the accused as well as from the extent and severity of the victim's injuries. State v. Keating, 00-51 (La.App. 5 Cir. 10/19/00), 772 So.2d 740, 743.
Defendant argues that the state proved, at most, that she was guilty of manslaughter, a lesser included offense to second-degree murder. The manslaughter statute, LSA-R.S. 14:31, provides, in pertinent part:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.
"Sudden passion" and "heat of blood" distinguish manslaughter from murder, but they are not elements of the offense. Rather, they are mitigatory factors in the nature of a defense, and when the defendant establishes such factors by a preponderance of the evidence, he is entitled to a manslaughter verdict. State v. Lombard, 486 So.2d 106, 110-111 (1986); State v. Johnson, 01-1362 (La.App. 5 Cir. 5/29/02), 820 So.2d 604, 610, writ denied, 02-2200 (La.3/14/03), 839 So.2d 32. Provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person, one with ordinary self-control. State v. Deal, 00-0434 (La.11/28/01), 802 So.2d 1254, 1260, cert. denied, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002).
Defendant testified at trial that Fluence left the house on the afternoon of September 3 to complete some errands. She did not see Fluence again until 12:30 on the morning of September 4, when he appeared at Weegie's. Veronica Nicholson, defendant's neighbor, testified that she saw defendant and David Fluence at Weegie's prior to the incident, and that the couple were dancing, drinking, and having a good time.
Defendant testified that Mr. Fluence, under the influence of alcohol, initiated an argument. In her taped interview with Detective Hymel, defendant indicated it was she who started the altercation that led to Mr. Fluence's death. While they were at Weegie's, she confronted Fluence regarding where he had been that day. He told her he had taken his son to the hospital to have a sprained ankle treated.[3] Defendant accused him of lying. She suspected he was seeing another woman. The two argued at the nightclub and continued to quarrel on the drive home.
After the couple arrived at the house, Mr. Fluence broke a broomstick in the living room, slapped her face, and shoved her against a chair. Defendant went into another room and armed herself with a *995 knife. She returned to the living room. Her hand slipped, and the knife went into Fluence's chest.
Defendant argues that the discovery of Fluence's infidelities was a situation sufficient to deprive the average person of self-control and cool reflection. In some instances, such might be the case. However, in her statement, defendant told the officer that she suspected that Fluence was being unfaithful to her for quite some time. This argument about Fluence's infidelities was apparently a continuation of an ongoing dispute between defendant and Fluence. On the night of the stabbing, defendant provoked Mr. Fluence by questioning him about his activities.
Viewing the evidence presented at trial in the light most favorable to the prosecution, we find that the state proved the essential elements of second degree murder beyond a reasonable doubt. We also find that defendant failed to prove by a preponderance of the evidence that she acted in sudden passion or heat of blood. Accordingly, the arguments raised by defendant in this assigned error are without merit.

ASSIGNMENT OF ERROR NUMBER FOUR
In his last assignment of error, defendant requests that we review the record for errors patent. LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). Our review reveals no errors patent.
For the reasons set forth herein, we hereby affirm defendant's conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Detective Todd Hymel testified that he did not know of anyone who was in defendant's house aside from defendant and the victim. He stated that if anyone else had been there, he would have learned about it as supervising officer of the investigation.
[2] Dr. Susan Garcia, who performed an autopsy on the victim's body, testified that the knife wound was four to five inches deep.
[3] According to defendant's trial testimony, Fluence's explanation was that he had been with his siblings.