MARC E. JOHNSON, Judge.
|PDefendant, Willie Jones, appeals his conviction and sentence for second degree murder from the 24th Judicial District Court, Division “M”. For the following reasons, we affirm the conviction and vacate the sentence in part, and remand the matter for further proceedings.
FACTS AND PROCEDURAL HISTORY
On August 26, 2010, Defendant, Willie Jones, was indicted by a Jefferson Parish Grand Jury for the second degree murder of Perry Noel, a violation of La. R.S. 14:30.1. Defendant pleaded not guilty at arraignment. Defendant filed various pretrial motions, including motions to suppress evidence and identification, which were heard and denied by the trial court on March 24, 2011.
The matter was tried before a 12-person jury on March 14-15, 2012. On the second day of trial, the State filed a Motion in Limine, seeking to prohibit the defense from introducing improper character evidence and/or evidence of other crimes, wrongs, or acts of the victim. The trial court granted the State’s motion that same day. The following facts were taken from the trial.
|oOn April 29, 2010, Deputy Pamela Mel-ford, of the Jefferson Parish Sheriffs Office, was driving southbound on Ames Boulevard when she was flagged down by a woman who advised her that someone had just been shot at the corner of Ames Boulevard and Mount Kennedy Drive. Upon arriving at the scene, Deputy Melford observed the victim, 40-year-old Perry Noel, lying face down on the sidewalk. Deputy Melford notified headquarters and requested that EMS be dispatched to her location. She approached the bystanders that had gathered and asked them whether anyone had seen or heard anything. No one came forward with any information at that time.
Soon thereafter, Deputy Abraham Andi-no arrived on the scene to investigate the homicide. When he arrived, several people had gathered in the area in front of a nearby convenience store. No casings were recovered at the scene. The only other physical evidence present at the scene was a bicycle and a rag. No other objects, weapons, or bottles were found on or near the victim’s body. There were also no weapons found in the victim’s pockets.
Upon learning that a potential witness, Paul Babineaux, had been transported to the Detective’s Bureau, Deputy Andino turned the scene over to Captain Dennis Thornton, so he could interview the witness. Information provided by Babineaux indicated that the suspect was a black male, 17 to 19 years of age, with dread-lock-styled hair. Deputy Andino compiled a photographic lineup based on Babi-neaux’s description; however, Babineaux was unable to identify any of the men as *79 the person he had observed running from the scene. That particular photographic lineup did not contain a picture of Defendant.
While Deputy Andino was searching in the database for additional photographs, Veronica and Braxton Clement arrived at the Bureau stating that they had information about the homicide. Based upon the information they separately 1¿provided, Defendant was developed as a suspect. Another photographic lineup with Defendant’s picture was compiled and presented to Babineaux and Braxton Clement by Detective Burke and Sergeant Kevin Decker. Thereafter, an arrest warrant for Defendant was prepared.
Deputy Andino also prepared a search warrant for Defendant’s residence located at 5325 Tulip, which was near the scene of the homicide. After knocking on the door and receiving no response, deputies forced entry into the home. Defendant was located in one of the upstairs bedrooms. Deputy Andino transported Defendant to the Detective Bureau, while the other deputies completed the search of the home. Pursuant to the search, deputies seized live ammunition, gun grips, warranty cards, and a couple of speedloaders.[1]
A few days later, on May 4, 2010, a parish employee was cutting grass on the canal bank on Tulip Court when he discovered three guns and called the Jefferson Parish Sheriffs Office. Two of the recovered guns, a .45 Ruger and a .357 Rossi, had been reported stolen on April 7, 2010.
On the evening of the homicide, Babi-neaux was living at the Ridgefield Apartments located off of Mount Kennedy Drive. Babineaux testified that he was standing next to a fire hydrant near his apartment complex when a man rode by on a bicycle and appeared to be “kind of tipsy.” Upon hearing a noise, Babineaux looked in the direction of Jake’s Seafood Restaurant where the man appeared to have fallen off of his bicycle and was sitting on the curb rubbing his arms.[2] | RBabineaux began walking away when he heard three gunshots.[3] Babineaux ran back to his previous location by the fire hydrant to see what was happening when three young black men ran by him. While running by him, one of the men stated “[s]omebody’s shooting back there.” Babi-neaux testified that the young man’s hand was inside his pants or holding up his pants. The young man who spoke to Babi-neaux was slim, had long braided hair, was wearing a black shirt and shorts, appeared to be between 17 and 19 years old, and was approximately 5'5" to 5'6" tall. Babineaux testified that he identified the young man who spoke to him that day from a photographic lineup shown to him by the police after the incident.
Eighteen year-old Braxton Clement testified that he has known Defendant for approximately five years and was best *80 Mends with Defendant at the time of the shooting.[4] Braxton testified that on the day of the shooting, he was at a girl’s house on Ames Boulevard with Defendant, Kris Ellis, Richard, and the victim. Brax-ton and Defendant arrived separately, and the victim arrived ten to fifteen minutes later on a bicycle. Braxton testified that Defendant and the victim engaged in an argument, which he described as “just a few words passed back and forth. It wasn’t my business, so I didn’t really pay any mind to it.”[5] Braxton testified that Defendant was “backing up, telling him leave me alone, basically.”[6] Braxton also testified that the victim never brandished a weapon, and Defendant and the victim were “just fussing.”
The victim eventually left the house. Ten to fifteen minutes later Braxton, Defendant, and Richard left the house to meet up with Ellis at the Ames Express Store. According to Braxton, Ellis entered the convenience store while he, [ (¡Richard, and Defendant kept walking. When they heard a noise behind them, they turned around to find the victim standing there with a broken bottle in his hand. Braxton testified that the victim was holding the top half of the bottle and had discarded the bottom half.[7] Braxton testified that after that he “really didn’t pay attention. Once I walked past him[,] I didn’t look back. I just knew he threw the bottom half away.” However, Braxton heard the victim tell defendant that “he’s still got love for him,” to which Defendant responded, “this ain’t (sic) no Tupac song.” Braxton testified that he kept on walking and heard the victim and Defendant engage in a shouting match.[8] Braxton did not see anything that was going on between the victim and Defendant because they were behind him.[9] A minute or two later, Braxton heard three gunshots. At trial, Braxton testified that he did not see Defendant fire the gun but admitted telling the police that he did. However, Brax-ton also testified that Defendant was the only person shooting a gun that night. Braxton testified that, if Defendant were in danger, he would come to Defendant’s aid. In this case, he did not aid Defendant because he “felt that he was a grown man. He can handle himself, but it didn’t really seem like a big problem at the time. It just seemed like fussing.”
After the shots were fired, Defendant and Braxton ran from the scene and met up later that evening; but, they did not talk about what had transpired.[10] Brax- *81 ton’s mother picked both of them up on Mount Kennedy approximately one hour after the shooting. Defendant’s mother was with Braxton’s mother in the car. |7Braxton testified that their mothers already knew what happened because someone had called and told her. While in the car, Defendant denied getting into a fight.
After dropping Defendant and his mother off at their home, Braxton’s mother brought him to the Detective’s Bureau.[11] Braxton identified Defendant and Ellis from a photographic lineup. On re-direct examination, Braxton reiterated that he believed the interaction between Defendant and the victim was a fussing match, and that he believed it was “not that big of a deal.”
Dr. Susan Garcia, an expert in the field of forensic pathology, testified that she performed the autopsy on the victim in this case. Dr. Garcia testified that the victim died as a result of a single gunshot wound that entered through the anterior chest and perforated his aorta.[12] Considering the nature of the wound, Dr. Garcia testified that blood loss would be fairly rapid. The toxicology results indicated that the victim had traces of marijuana, muscle relaxant, and an elevated level of alcohol in his blood.
Captain Dennis Thornton of the Jefferson Parish Sheriffs Office testified that the murder weapon, a .357 revolver, was located and returned to its owner, Michael Turner, who had no participation in the subject homicide. Captain Thornton supervised the search of the victim’s body and testified that no weapons were found on his person or his area.
Sergeant Kevin Decker, also of the Jefferson Parish Sheriffs Office, assisted Deputy Andino in investigating the homicide. Sergeant Decker testified that he had located one cooperative witness, Paul Babineaux, at the scene, who was transported to the Detective’s Bureau for questioning. No weapons or any objects that could have been used' as potential weapons were found around the victim’s | «body. While at the Detective’s Bureau, Veronica and Braxton Clement arrived and were questioned. Based on discussions with the Clements, Defendant’s name was provided and a photographic lineup was prepared and presented to Babineaux. Babineaux identified Defendant as the suspect he observed running past him. Later, Sergeant Decker was notified by the Jefferson Parish Works Department of the discovery of three guns on the canal bank in the 5300 block of Tulip. The three weapons recovered were a' Rossi .357 revolver, a .45 Ruger, and a .380 Bersa. The weapons were recovered approximately six houses down from Defendant’s residence. The revolver contained three spent cartridges, and three live cartridges, one of which was a misfire, indicated by the strike on the primer.[13] The ammunition contained in the revolver was Speer 38.
Also, as part of the investigation, Sergeant Decker located and interviewed Kristopher Ellis, who was present when the incident occurred. Ellis was presented with a photographic lineup from which he identified Defendant.
*82 Nineteen year-old Kristopher Ellis testified that he has known Defendant since 2010. Ellis admitted to having felony convictions for resisting arrest, receiving stolen things and simple burglary. On the day of the homicide, Ellis had seen Defendant and Braxton at Roshanda’s[14] house on Mount Kennedy. When Ellis left Rosh-anda’s house, he walked down Ames toward the store, with Braxton and Defendant following close behind. Ellis testified that he did not see the victim at Roshan-da’s house that day. Ellis testified that he went into the store and was speaking with the store’s owner. When he came out of the store, he heard a man arguing but could not tell who it was. Ellis assumed it was the victim because he believed he saw the victim before he entered the store but stated that he, could not 19hear the words exchanged because there was music playing. Ellis conceded that he told the police that “[t]hey exchanged two like two words or whatever, and the next thing you know I heard gunshots.” After the shots were fired, Ellis saw Defendant running. Ellis testified that he did not see the victim with a gun, and that he could not say whether he had a bottle or any other weapon because he was “not really paying attention.” After the shooting, Ellis ran back to Rosh-anda’s house.
Veronica Clement, Braxton’s mother, testified that on the night of the shooting, she received a phone call from a friend indicating that she had seen Braxton and some other boys running “from or to a situation” that “didn’t look right to her.” She tried to look for Braxton but could not find him; so, she drove to Defendant’s house where she spoke to his mother. She then left the residence with Defendant’s mother and went in search of her son. They later found Braxton and Defendant walking on Mount Kennedy. Once in the car, Defendant was questioned about what happened. Initially, Defendant did not answer. However, when asked where they had been, Defendant stated that they were in Orleans Village and then said they were at Mac Park. Defendant denied having been involved in a fight and denied that anything happened with a gun. Ms. Clement testified that she dropped Defendant and his mother off at their home. Once alone with her son, and after much urging, Braxton spoke to her and appeared to be upset. Based upon their conversation, she decided to take Braxton to the Detective’s Bureau.
Michael Turner testified that he knew Defendant as a friend of his wife’s eldest sons, Alvin and Adrian. Turner further testified that, in April of 2010, he reported his .45 Ruger and .357 Rossi stolen. . Turner testified that the gun case which contained the two guns was stolen from his home where he lived with his wife and her younger son, Aaron. There did not appear to be any forced entry into |inthe home. Their sons denied taking the guns, so Turner called the police to report them stolen. According to Turner, the only people who had keys to the front door of their house were his wife and her sons, Adrian and Alvin.[15]
*83 A few months later, Turner received a call from the Jefferson Parish Sheriffs Office advising him that his guns had been recovered. Turner further testified that the stolen gun case also contained magazines for the .45 Ruger, speedloaders for the .357 Rossi, and manuals for each weapon. Turner identified the .357 Rossi and the other items recovered during the search of Defendant’s residence as belonging to him, which included the following: the registration card for the Rossi, the manuals for the weapons, the Academy Sport return policy for the Rossi, the extra magazines for the .45 Ruger, the speed-loaders, and the handgrips for the .45 Rug-er.
Jene Rauch, expert in firearms and tool mark analysis, testified that the projectile recovered during the autopsy of the victim was fired by the .357 Rossi revolver. Rauch testified that the bullets recovered from Defendant’s residence were the same type of ammunition (Speer 38) found inside the revolver.
The State rested, and Defendant testified on his own behalf. Defendant testified that he lives at 5325 Tulip Court and was 17 years old at the time of the shooting on April 9, 2010. According to Defendant, on the afternoon of April 9, 2010, he and Braxton were “at some girl’s house on Ames,” when the victim came out of nowhere “talking about stupid things, saying stuff stupid to me ... and the girls.” Defendant testified that he knew the victim from the neighborhood. Defendant further testified that, “out of the blue,” the victim broke a bottle and | n stated, “I’ll cut you. I’ll cut you.” Defendant testified that he was scared, so he did not say anything to the victim. The victim later left on his bicycle in the direction of Mount Kennedy.
Fifteen minutes later, Braxton and defendant left the girl’s house and headed towards the convenience store on Mount Kennedy. When they arrived at the store, the victim was there, and he still had the broken bottle in his hand. Defendant testified that he attempted to distance himself from the victim who was “cussing” and arguing with him. According to Defendant, the victim then reached into his pocket and grabbed what appeared to be a rag with something black inside of it. Defendant testified that the object looked like a “gun, a knife or something. I don’t know. I could see like a little knob on it.” Defendant stated that the victim continued to curse at him with the bottle in his hand and was walking towards him, which is when defendant pulled out his gun and shot him. Defendant testified that he did not try to shoot him, but that he shot a “couple of times” trying to keep the victim away from him' because he was scared and thought the victim was going to kill him. Defendant then ran down Mount Kennedy. Defendant testified that he had a gun because “people always messing with me and stuff’ because he is small, and “people always bullying me, picking on me, beating me up.”
Defendant further testified that he obtained the gun from his brother’s room. Defendant stated that he put the gun in his pocket that day because he was tired of being “messed with” and with people picking on him. Defendant testified that he knew the victim from the neighborhood as someone who was always “messing with people” and fighting.[16]
|12On cross-examination, Defendant testified that there were a lot of people around when the victim was coming at him with a bottle, but he did not shout out for help. *84 Defendant further testified that “from 50 feet away, I just shot in his direction. I didn’t even aim. I just shot hoping he’d leave me alone.” After Defendant returned home, he threw the gun used to shoot the victim, along with two other firearms, into some tall grass by someone’s house to get rid of them.
At the conclusion of the trial, the jury found Defendant guilty as charged. Defendant filed a Motion for Post Verdict Judgment of .Acquittal and a Motion for New Trial, both of which were heard and denied by the trial court on March 26, 2012. On that same date, the trial court sentenced Defendant to life imprisonment at hard labor, without the benefit of parole, probation, or suspension of sentence. Defendant’s timely Motion for Appeal was filed and granted on the same day as sentencing, March 26, 2012. The instant appeal followed.
On March 6, 2013, Defendant filed a Motion for Production of Documents, which requested the appellate record for the purpose of filing a Pro Se Supplemental Appellate Brief. This Court granted the motion on March 25, 2013 and allowed Defendant to view the appellate record until April 22, 2013 and file a supplemental brief by the same date. The appellate record was returned to this Court’s Clerk’s Office on April 24, 2013; however, no supplemental brief has' been filed. Accordingly, we will review the assignments of error raised in Defendant’s counseled appellate brief.
ASSIGNMENTS OF ERROR
On appeal, Defendant raises the following assignments: 1) there was insufficient evidence to convict him of second degree murder; 2) the trial court erred in granting the State’s Motion in Limine; and 3) he received an excessive sentence.
| isLAW AND ANALYSIS

Sufficiency of Evidence

Defendant argues that the trial court erred in denying his Motion for Post Verdict Judgment of Acquittal and his Motion for New Trial.[17] Specifically, Defendant contends that the State failed to *85 prove that he had the specific intent to kill or inflict great bodily harm because he was acting'in self-defense. Defendant maintains that, at most, he should have been convicted of manslaughter.
The State responds that the evidence was sufficient to establish Defendant’s specific intent to kill or inflict great bodily harm. The State farther asserts that the State carried its burden of proving that Defendant did not act in self-defense. The State also maintains that the mitigatory factors necessary to sustain a convictioh for manslaughter were not established by a preponderance of the evidence.
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674 (La.6/29/01); 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). In cases involving circumstantial evidence, the trial court must instruct the jury that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438.
The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Mitchell, 99-3342 (La.10/17/00); 772 So.2d 78, 83; State v. Washington, 03-1135 (La.App. 5 Cir. 1/27/04); 866 So.2d 973, 977.
When the trier of fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04); 875 So.2d 949, 955, writ denied, 04-1605 (La.11/15/04); 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to convict. State v. Addison, 00-1730 (La.App. 5 Cir. 5/16/01); 788 So.2d 608, 613, writ denied, 01-1660 (La.4/26/02); 814 So.2d 549. Further, it is not the function of the appellate court to assess the credibility of witnesses or to reweigh the evidence. Bailey, swpra.
In this ease, Defendant was convicted of second degree murder. Second degree murder is defined as the killing of a human being when the offender: 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even 11Kthough he has no intent to kill or to inflict great bodily harm. See La. R.S. 14:30.1; State v. Lewis, 05-170 (La.App. 5 Cir. 11/29/05); 917 So.2d 583, 589-90, writ denied, 06-0757 (La.12/15/06); 944 So.2d 1277. In addition to proving the statutory elements of the charged offense at trial, the State is required to prove defendant’s identity as the perpetrator. State v. Draughn, 05-1825 (La.1/17/07); 950 So.2d 583, 593, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007); State v. Ingram, 04-551 (La.App. 5 Cir. 10/26/04); 888 So.2d 923, 926.
*86 In the instant case, the State proceeded under the first theory of second degree murder. As such, to prove second degree murder the State was required to prove (1) the killing of a human being, and (2) that the defendant had specific intent to kill or inflict great bodily harm. State v. Pagan, 04-1478 (La.App. 5 Cir. 5/31/05); 905 So.2d 435, 441, writ denied, 05-2003 (La.2/17/06); 924 So.2d 1013. Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Specific intent need not be proven as a fact, but may be inferred from the circumstances surrounding the offense and the conduct of the defendant. Whether a defendant possessed the requisite intent in a criminal case is a question for the trier of fact, and a review of the correctness of this determination is guided by the Jackson standard. State v. Gonzalez, 07-449 (La.App. 5 Cir. 12/27/07); 975 So.2d 3, 8, writ denied, 08-0228 (La.9/19/08); 992 So.2d 949.
Specific intent to kill can be inferred from the intentional use of a deadly weapon such as a knife or a gun. State v. Knight, 09-359 (La.App. 5 Cir. 2/9/10); 34 So.3d 307, 317, writ denied, 10-2444 (La.10/21/11); 73 So.3d 376. Specific intent may be inferred from the circumstances and from the defendant’s actions, and the intent to kill or to inflict great bodily harm may be inferred from the extent |1Gand severity of the victim’s injuries. State v. Graves, 99-113 (La.App. 5 Cir. 8/31/99); 740 So.2d 814, 816, writ denied, 99-3013 (La.3/31/00); 759 So.2d 68. “The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill.” Gonzalez, 07-449; 975 So.2d at 8.
Here, Defendant challenges the element of specific intent by claiming the evidence proves that he acted in self-defense. Given the evidence produced at trial, the jury could have reasonably inferred that Defendant had specific intent to kill or inflict great bodily harm. Although the victim died as a result of a single gunshot wound to the chest, the evidence at trial established that Defendant fired, at least, three shots at the victim. Witnesses Babineaux and Braxton both testified that they heard three gunshots. Defendant also admitted to shooting at the victim “a couple of times” to keep him away. Moreover, after examination of the murder weapon, it was discovered that the revolver contained three spent cartridges and three live cartridges, one of which was a misfire, as indicated by the strike on the primer. Defendant further admitted that he armed himself with a gun on the day of the murder because he was tired of being “messed with” and with people “picking on him.” Thus, we find that the State proved the requisite specific intent to kill the victim by proving that Defendant aimed and discharged a lethal weapon in the victim’s direction. See Gonzalez, supra.
Despite this evidence, Defendant contends that he acted in self-defense. Defendant’s self-defense theory was presented to and rejected by the jury at trial.
According to La. R.S. 14:20, a homicide is justifiable “[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger,” or
|17[w]hen committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary *87 for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.
The fact that an offender’s conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. La. R.S. 14:18. When a defendant claims self-defense in a homicide case, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. State v. Cassard, 01-931 (La.App. 5 Cir. 2/26/02); 811 So.2d 1071, 1076, writ denied, 02-0917 (La.12/19/02); 833 So.2d 327. The relevant inquiry on appeal is whether a rational fact-finder, after viewing the evidence in the light most favorable to the prosecution, could have found, beyond a reasonable doubt, that the homicide was not committed in self-defense. Id.
The determination of a defendant’s culpability focuses on a two-fold inquiry: (1) from the facts presented, could the defendant reasonably have believed his life to be in imminent danger; and (2) was deadly force necessary to prevent the danger. State v. Theriot, 07-71 (La.App. 5 Cir. 6/26/07); 963 So.2d 1012, 1020, writ denied, 07-1598 (La.2/1/08); 976 So.2d 715; State v. T.N., 94-669 (La.App. 5 Cir. 1/18/95); 650 So.2d 288, 289. While there is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a defendant had a reasonable belief that deadly force was necessary to avoid the danger. T.N., 94-669; 650 So.2d at 290. Additionally, a person who is the aggressor or who brings on a difficulty cannot claim self-defense, unless he withdraws from the conflict in good faith. State v. Mills, 04-489 (La.App. 5 Cir. 3/29/05); 900 So.2d 953, 959, writ denied, 05-1470 (La. 1/13/06); 920 So.2d 235 (citing La. R.S. 14:21). The jury is the ultimate fact-finder in determining whether [ 1sa defendant proved his condition and whether the State negated the defense beyond a reasonable doubt. Theriot, 07-71; 963 So.2d at 1020.
The State in this matter presented evidence that the victim was not killed in self-defense. At trial, Defendant testified that on the day of the shooting, the victim threatened to cut him with a broken bottle while at a friend’s house. However, Defendant’s testimony was contradicted by Braxton who testified that, while at their friend’s home, the victim never brandished a weapon and/or broken bottle, and that Defendant and victim were “just fussing.” [18] Later that evening, Defendant and Braxton encountered the victim in front of a convenience store, where, according to Braxton, the victim and Defendant began arguing.[19] Braxton stated that if Defendant were in danger he would have come to his aid, however, “it did not seem like a big problem at the time. It just seemed like fussing.” Braxton further testified that he heard the victim tell Defendant that “he’s still got love for him,” to which Defendant responded “this ain’t [sic] no Tupac song.” A minute or two later, shots were fired.
Additionally, Ellis testified that Defendant and the victim “exchanged two like two words or whatever, and the next thing you know I heard gunshots.” Nei *88 ther Ellis nor Braxton testified that they observed the victim with a gun. And, while Defendant claimed the victim was armed with a broken bottle,[20] and that he saw the victim reach into his pocket and grab what appeared to be a rag with something black inside of it, the only other physical evidence found at the scene 119were a bicycle and a rag. No other objects, weapons, or bottles were found near the victim’s body. There were also no weapons found on the victim’s person. Additionally, a test for gunshot residue was performed on the victim and the results were negative.
Furthermore, Defendant testified at trial that “from 50 feet away, I just shot in his direction. I didn’t even aim. I just shot hoping he’d leave me alone.” Defendant also admitted that after shooting the victim “a couple of times,” he fled from the scene and disposed of the gun when he returned home. Accordingly, we find that Defendant’s actions in this case are inconsistent with a. theory of justifiable homicide. (See State v. Wallace, 612 So.2d 183, 191 (La.App. 1st Cir.1992), writ denied, 614 So.2d 1253 (La.1993). A defendant’s flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. State v. Cazenave, 00-183 (La.App. 5 Cir. 10/31/00); 772 So.2d 854, 860, writ denied, 00-3297 (La. 10/26/01); 799 So.2d 1151).
Defendant also suggests that the verdict against him should have been guilty of manslaughter at most. Manslaughter is a homicide that would be either first or second degree murder, except that the offense was committed in “sudden passion” or “heat of blood” caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31(A)(1). “Sudden passion” and “heat of blood” are not elements of the offense of manslaughter; rather, they are mitigatory factors that may reduce the grade of the offense. State v. Dobbins, 05-342 (La.App. 5 Cir. 12/27/05); 920 So.2d 278, 284.
In order to be entitled to the lesser verdict of manslaughter, a defendant is required to prove the mitigatory factors by a preponderance of the evidence. Id. Provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person, one with ordinary self-control. State v. Deal, 0(M34 (La.11/28/01); 802 So.2d 1254, 1260, cert. denied, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002). The question for this Court on review is whether a rational trier-of-fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. State v. Lawson, 08-123 (La.App. 5 Cir. 11/12/08); 1 So.3d 516, 523.
Here, Defendant claims that while at a friend’s house, the victim threatened him at least thirty minutes prior to the shooting with a broken bottle stating “I’ll cut you.” However, contrary to Defendant’s *89 testimony, Braxton testified that the victim did not threaten Defendant with a weapon and/or bottle prior to the shooting. Nonetheless, even if the victim had threatened Defendant earlier that day, the law does not permit an individual to track down his enemy, shoot him with a firearm, and then claim justification for the homicide because of prior threats. State v. Patterson, 10-415 (La.App. 5 Cir. 1/11/11); 63 So.3d 140, 151, writ denied, 11-0338 (La.6/17/11); 63 So.3d 1037 (citing State v. Arabie, 496 So.2d 554, 558 (La.App. 1st Cir.1986), writ denied, 502 So.2d 565 (La.1987)).
Defendant further testified that he encountered the victim again in front of a convenience store, where the victim still had the broken bottle in his hand. Defendant’s testimony'was again contradicted by Braxton’s statement to the police that the victim had discarded both halves of the broken bottle, and by the physical evidence at the scene which did not reveal the presence of a broken bottle, or weapon on or near the victim. Moreover, although Defendant testified that he was scared of the victim, he also testified that he was approximately 50 feet away from the victim when he fired three gunshots at him. And, although Defendant testified that the victim was cussing and arguing with him, Braxton characterized their interaction as “fussing,” noting that the victim stated, “I still got love for you,” |21before he was shot.[21] Additionally, Braxton’s testimony established that he was not alarmed or concerned about the victim’s words or alleged actions, since he did not come to Defendant’s aid. Thus, we find Defendant failed to prove provocation sufficient to deprive an average person of his self-control and cool reflection by a preponderance of the evidence.
By returning a guilty verdict, the jury obviously rejected Defendant’s account of the events and found that Defendant’s actions were neither reasonable nor apparently necessary. It is the role of the fact-finder to weigh the credibility of the witnesses, and a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. State v. Wallace, 00-1745 (La.App. 5 Cir. 5/16/01); 788 So.2d 578, 584, writ denied, 01-1849 (La.5/24/02); 816 So.2d 297. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Defendant had the requisite intent to support his conviction for second degree murder, that Defendant failed to carry the burden necessary to reduce the conviction to manslaughter, and that Defendant did not act in self-defense.
Accordingly, we find that the trial court did not abuse its discretion in denying Defendant’s Motion for Post Verdict Judgment of Acquittal and Motion for New Trial.

Motion in Limine

Defendant next contends that the trial court erred in granting the State’s Motion in Limine, finding that there was no evidence of an overt act or hostile demonstration on the part of the victim in this case, thus, prohibiting the | ¡^introduction of evidence regarding the victim’s prior convictions. According to Defendant, his version of the events was sufficient to warrant introduction of the victim’s multiple convictions, which he claims would, have given *90 greater weight to his testimony and his fear of the victim.
In response, the State contends that the trial court did not err in denying Defendant’s request to introduce the victim’s “rap sheet” because Defendant failed to establish an overt act or hostile demonstration on the part of the victim.
On the second day of trial, the State filed a Motion in Limine to Prohibit the Defense from Introducing Improper Character Evidence and or Evidence of Other Crimes, Wrongs, or Acts of the Victim at Trial. Prior to ruling on the motion, the defense argued that Braxton’s testimony established an overt act committed by the victim when he testified that the victim had a bottle in his hand and was walking toward Defendant cursing, while Defendant was backing up. The State argued that Braxton’s testimony regarding the bottle was impeached at trial and that the evidence in fact established that the victim stated that he had love for the victim prior to being shot. The trial court granted the State’s motion, after taking the entirety of Braxton’s testimony into consideration, as well as the other witnesses who had testified, finding that there had not been a showing of an overt act at the time of the incident.[22]
At the conclusion of the trial testimony, Defendant again re-urged his request to admit the victim’s “rap sheet” into evidence. In response the State maintained that specific acts are inadmissible to prove a victim’s character, and further argued that Defendant’s self-serving testimony did not establish an overt act. The trial court again stated that the evidence was inadmissible. Defendant then proffered the victim’s prior convictions into evidence.
DaEvidence of the decedent’s dangerous character or of his threats against the defendant may be admissible in sdpport of a plea of self-defense, provided that the defendant first produces evidence that the decedent had made a hostile demonstration or overt act against the accused at the time of the incident. State v. Lee, 331 So.2d 455, 458 (La.1975). Such evidence supports a plea of self-defense because it is relevant to show that the victim was the aggressor and to show that the defendant’s apprehension of danger was reasonable. State v. Edwards, 420 So.2d 663, 669 (La.1982). A trial judge’s determination that a defendant has not laid a sufficient evidentiary foundation upon which to introduce- testimony concerning the victim’s dangerous character will not be disturbed on appeal, absent a finding of clear error. State v. Jackson, 419 So.2d 425, 427 (La.1981).
La. C.E. art. 404 governs the admissibility of such evidence and states, in pertinent part:
A. Character evidence generally. Evidence of a person’s character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
[[Image here]]
(2) Character of victim, (a) Except as provided in Article 412, evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible[.]
[[Image here]]
[[Image here]]
*91 B. Other crimes, wrongs, or acts. (2) In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim’s prior threats against the accused or the accused’s state of mind as to the victim’s dangerous character is not admissible[.]
[[Image here]]
| ¾An overt act within the meaning of Article 404 is an act of the victim that manifests in the mind of a reasonable person a present intention on his part to kill or do great bodily harm. State v. Jones, 99-798 (La.App. 5 Cir. 11/10/99); 748 So.2d 1176, writ denied, 00-306 (La.12/08/00); 775 So.2d 1076. Once the defense has introduced appreciable evidence of the overt act, “the trial court cannot exercise its discretion to infringe on the fact-determination function of the jury by disbelieving this defense testimony and thus, deny the accused a defense permitted him by law.” Lee, 331 So.2d at 459; accord, State v. Schexnayder, 97-729 (La.App. 1 Cir. 4/8/98); 708 So.2d 851, 855, writ denied, 98-1665 (La.10/30/98); 723 So.2d 978.
In the present case, Defendant relied on his own trial testimony and the testimony of Braxton to establish an overt act. However, this testimony is not appreciable evidence of an overt act. As previously noted, while Defendant claimed that the victim approached him with a broken bottle and threatened him while at a friend’s house earlier in the day, Braxton did not corroborate his testimony. Rather, Brax-ton testified that the victim never brandished a weapon, and that Defendant and the victim were “just fussing.” Braxton also testified that he did not feel threatened by the victim. Further, although Braxton testified at trial that the victim had a broken bottle in his hand and was arguing with Defendant in front of the convenience store, he also conceded that he told the police that the victim had thrown the bottle away prior to the encounter. Braxton then testified that he did not aid Defendant because he “felt that he was a grown man. He can handle himself, but it didn’t really seem like a big problem at the time. It just seemed like fussing.”
Thus, the only evidence presented regarding the alleged overt act is Defendant’s own testimony that the victim reached into his pocket and grabbed 125what appeared to be a rag with something black inside of it that looked like a “gun, a knife or something. I don’t know. I could see like a little knob on it.” However, none of the physical evidence in this case corroborated Defendant’s version of the events. In addition, the police found no evidence of any weapons or bottles near or on the victim.
In Jones, supra, this Court found that the defendant’s self-serving testimony, alone, was insufficient to carry his burden of showing that the victim made a hostile demonstration or committed an overt act against him. Likewise, State v. Martin, 562 So.2d 468, 470 (La.App. 5th Cir.1990), writ denied, 566 So.2d 987 (La.1990), concluded there was insufficient appreciable evidence of an overt act or hostile demonstration where the defendant’s testimony stood alone, and it was generally in sharp conflict with other testimony and evidence.
Based on the foregoing, we find that Defendant failed to establish that the victim made a hostile demonstration or committed an overt act against him at the time of the incident. Thus, we find that the trial court did not err in granting the State’s Motion in Limine and refusing to allow evidence of the victim’s prior convictions into evidence.

*92
Excessive Sentence

Defendant argues that his sentence is excessive based on his age, lack of violent criminal history, and the fact that he committed the instant offense in self-defense. Defendant further complains that the trial court failed to provide reasons for the sentence.
As correctly noted by the State, the merits of Defendant’s assignment need not be addressed because the record reflects that remand is appropriate for a new sentencing hearing in accordance with the principles annunciated in Miller v. Alabama, — U.S. —, 132 S.Ct. 2455, 2469, 183 L.Ed.2d 407 (2012).
| ^Defendant was sentenced on March 26, 2012, in accordance with La. R.S. 14:30.1 to life imprisonment without the benefít of parole, probation, or suspension of sentence. Defendant was 17 years old at the time the charged offense was committed.[23]
Under the recent United States Supreme Court case Miller v. Alabama, supra, a juvenile may not be sentenced to a mandatory life sentence without parole without the trial court first considering an “offender’s youth and attendant characteristics as mitigating circumstances before deciding whether to impose the harshest possibly [sic] penalty.” In this case, the trial court did not consider these factors prior to sentencing Defendant to life imprisonment without the possibility of parole. Notably, Defendant was sentenced before the Miller decision.
Recently, this issue was addressed by the Louisiana Supreme Court in State Ex Rel. Albert Landry v. State of Louisiana, 2011-KH-0796 (1/18/13), 106 So.3d 106 (per curiam). In Landry, the defendant is presently serving a life sentence without the possibility of parole for a second degree murder that was committed in 1976 when the defendant was 17 years old. The Louisiana Supreme Court granted the relator’s writ application based on the following:
In 2011, relator filed a motion to correct an illegal sentence in which he contended that a sentence of life imprisonment without parole for a juvenile offender is no longer constitutionally permissible under developing legal standards, and in particular in light of Graham v. Florida, 560 U.S. [48], 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) (Eighth Amendment precludes sentencing juvenile offenders to life imprisonment without parole for non-homicide crimes). The district court (Johnson, J.) denied relief. While review of that judgment was pending, the United States Supreme Court determined that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment’s prohibition on “cruel and unusual punishments.” Miller v. Alabama, 567 U.S. [48], 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012). Unlike.the case in Graham,, the Miller court did not establish a categorical prohibition against life without parole for juveniles but | ¡>7instead required that a sentencing court consider an offender’s youth and attendant characteristics as mitigating circumstances before deciding whether to impose the harshest possibly penalty for juveniles.
Therefore, the Louisiana Supreme Court remanded the defendant’s case to the district court to reconsider his sentence after conducting a new sentencing hearing in *93 accordance with the principles enunciated in Miller v. Alabama, supra.
Accordingly, given the apparent retroactive applicability of the' Miller case, we vacate the portion of Defendant’s sentence that removes any meaningful opportunity to secure release, ie., parole from this offender, who was a juvenile at the time of this offense. Accordingly, the matter is remanded to the trial court to allow the trial judge to sentence Defendant in a manner allowing parole eligibility in accordance with the principles annunciated in Miller v. Alabama, supra.

Errors Patent

The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990). After review of the record and consideration of the remand pursuant to Miller v. Alabama, supra, there is no errors patent requiring corrective action.
DECREE
For the foregoing reasons, Defendant’s conviction is affirmed. Additionally, we vacate the portion of Defendant’s sentence that prohibits parole eligibility and remand the matter for resentencing in conformity with Miller v. Alabama, supra.

CONVICTION AFFIRMED; SENTENCE VACATED IN PART; REMANDED FOR FURTHER PROCEEDINGS

.Detective Stephen Sadowski of the Jefferson Parish Sheriff’s Office assisted in executing the search warrant at Defendant’s residence. During the search, he located two speedload-ers, .38 ammunition, grip panels, and two magazines for a .45 Ruger semiautomatic pistol in one of the bedrooms. Detective Sadow-ski also located a warranty card for a Rossi revolver, a manual for a Ruger semiautomatic pistol, and Academy Sports firearm return paperwork.

. Oji cross-examination, Babineaux testified that he was approximately 300 feet from the victim when he observed him sitting next to his bicycle, and that he did not see the victim interact with anyone.

. Approximately five to ten minutes had elapsed between the time the victim passed him on his bicycle and the time the shots were fired. Before the shooting, Babineaux testified that he did not hear any fighting or arguing.

. Braxton testified that Defendant had dreadlocks at the time of the shooting.

. Braxton testified that he did not feel threatened by the victim.

. Braxton did not provide this information to the police when he was first interviewed because "they never asked.”

. It was brought to Braxton’s attention that in his original statement to the police on April 29, 2010, he told them that the victim discarded both the top and bottom half of the bottle. At trial, Braxton read from his statement as follows: “Once we got off, we made a little turn. We could see him throwing the bottle away. He threw the first half away. He threw the second half away. Him (sic) and Willie [Defendant] [,] they had their words.”

. Braxton testified that he could hear the victim saying “F* * *, you ain't (sic) got to really have love for me. It is what it is.”

. However, on cross-examination, Braxton testified that, when the victim was cursing at Defendant, Defendant was walking at an angle, so "they wouldn’t bump heads or meet.” Additionally, Braxton stated that Defendant was walking backwards, away from the victim, while the victim was walking towards Defendant.

. Braxton testified that Defendant said a prayer after the shooting.

. In his statement, he told the police that he saw the victim throw both halves of the bottle away, and that he saw Defendant shoot the victim. Braxton also described the gun used by Defendant.

. A projectile was recovered from inside the victim’s body.

. The parties stipulated that the firearms and all of the evidence recovered from Defendant’s residence were tested for fingerprints with "negative results.”

. Roshanda’s last name is unknown.

. Turner noted that when Adrian and Alvin made the decision to live with their father, he asked for the house keys back. Turner retrieved Alvin's key; however, when he asked Adrian to return his key, he initially told him he could not find it. When he finally returned the key a week later, he noticed that it was a copy of the original one he had provided him.
On cross-examination, Turner testified that he did not believe Defendant stole his guns because he was unaware that Defendant had ever been to his house. However, on, redirect, Turner testified that his step-son Adrian was a friend of defendant.

. Defendant admitted that he had previously pleaded guilty to possession with intent to distribute marijuana, possession of paraphernalia, and resisting arrest.

. A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the State, does not reasonably permit a finding of guilty. La. C.Cr.P. art. 821(B). The question of sufficiency of the evidence is properly raised by a motion for post verdict judgment of acquittal. See La.C.Cr.P. art. 821; State v. Hampton, 98-0331 (La.4/23/99); 750 So.2d 867, 880, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999); State v. Bazley, 09-358 (La.App. 5 Cir. 1/11/11); 60 So.3d 7, I?:, writ denied, 11-0282 (La.6/17/11); 63 So.3d 1039. Thus, the denial of Defendant's Motion for Post Verdict Judgment of Acquittal based on the sufficiency of the evidence is properly before this Court on review.
"A motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case, the motion shall be denied, no matter upon what allegations it is grounded.” La.C.Cr.P. art. 851. The trial court's ruling on a motion for a new trial will not be disturbed on appeal absent a clear showing of an abuse of discretion. State v. Delagardelle, 06-898 (La.App. 5 Cir. 4/11/07); 957 So.2d 825, 829, writ denied, 07-1067 (La. 11/21/07); 967 So.2d 1154.
On motion of the defendant, the court shall grant a new trial whenever the verdict is contrary to the law and the evidence. La. C.Cr.P. art. 851(1). When a motion for new trial is based on the verdict being contrary to the law and the evidence, there is nothing for review on appeal. State v. Condley, 04—1349 (La.App. 5 Cir. 5/31/05); 904 So.2d 881, 888, writ denied, 05-1760 (La.2/10/06); 924 So.2d 163. However, both the Louisiana'Supreme Court and this Court have addressed the constitutional issue of the sufficiency of the evidence under this circumstance. Id. Therefore, the denial of Defendant’s Motion for New Trial based on the sufficiency of the evidence is properly before this Court on review.

. Notably, Ellis testified that he did not see the victim at the girl’s house that day.

. Babineaux, who was in close proximity to the shooting, testified that he did not hear any fighting or arguing prior to the shots being fired.

. At trial, Braxton corroborated Defendant’s testimony that the victim was carrying a broken bottle. However, Braxton also acknowledged that in his original statement provided to the police on the day of the shooting, he told them that the victim discarded both the top and bottom half of the bottle. Specifically, Braxton read the following from his statement: "He threw the first half away. He threw the second half away. Him [sic] and Willie [defendant] they had their words.” The trier-of-fact shall evaluate the witnesses' credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. State v. Singleton, 05-622 (La.App. 5 Cir. 1/31/06); 922 So.2d 647, 651. It is not the function of the appellate court to assess the credibility determinations of the trier of fact or to reweigh the evidence. Id.

. Words or gestures, regardless of how insulting, are not sufficient to reduce a homicide from murder to manslaughter. State v. Arias-Chavarria, 10-116 (La.App. 5 Cir. 9/28/10); 49 So.3d 426, 433, writ denied, 10-2432 (La.2/25/11); 58 So.3d 460 (citation omitted).

. Defendant noted his objection to the trial court's ruling.

. Defendant’s birthdate is April 9, 1993, and the subject offense occurred on April 29, 2010.